**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORR SOLOMON, on behalf of herself and others similarly situated, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Case No. 10-5961 |
| | ) ) | |
| BANK OF AMERICA, N.A. a/k/a BANK OF AMERICA CORPORATION, NCO FINANCIAL SYSTEMS, INC., COLLECTO, INC., d/b/a COLLECTION COMPANY OF AMERICA a/k/a EOS CCA, and U.S. ASSET MANAGEMENT, INC., | ) ) ) ) ) ) ) | **TRIAL BY JURY DEMANDED** |
| Defendants | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Morr Solomon ("Plaintiff" or "Ms. Solomon"), individually and on behalf of a

class defined below, brings this action against Defendants Bank of America, N.A., a/k/a Bank of

America Corporation ("Defendant Bank"), NCO Financial Systems, Inc. ("NCO"), Collecto, Inc.

d/b/a Collection Company of America a/k/a EOS CCA ("CCA"), and U.S. Asset Management,

Inc. (collectively referred to as "Defendants") to obtain restitutionary, injunctive, and declaratory

relief, compensatory and punitive damages, and other remedies, as described herein.  Based on

her personal experience and the investigation of her counsel, Plaintiff avers the following:

**PRELIMINARY STATEMENT**

1.      This suit is about the Bank of America's unfair, deceptive, fraudulent, and

unconscionable practice of (i) conducting either no investigation at all or grossly inadequate

investigations of consumers' claims of errors and unauthorized electronic transactions and (ii)

manipulating consumers' debit transactions with a view to maximizing overdraft fees and other exactions and unjustly enriching itself. Bank customers frequently find themselves in want of cash or other reduced circumstances necessitating an ATM withdrawal from their account using a debit card; but the Bank fails to properly monitor activities on its customers' accounts, including electronic fund transfers, fails to take measures to ensure a customer's debits due to electronic transfers do not exceed the balance, and permits debits to deplete the balance and run up overdraft, non-sufficient fund, maintenance, and other fees. Worse, when presented with clear proof that the customer did not, and could not, obtain any monies or benefit in any way, shape, or form from a debit transaction through an electronic fund transfer, the Bank ignores such evidence and either fails to investigate the claim altogether or fails to investigate the claim timely, adequately and in good faith, in violation of the Electronic Fund Transfers Act, the written contract with its debit cardholders and account holders, the implied covenant of good faith and fair dealing, similar consumer protection statutes of several states and the uniform principles of right to privacy, unconscionability, unjust enrichment, and agency/fiduciary obligations. This common practice has a tremendous adverse impact on consumers across the country, resulting in millions of dollars in improperly assessed fees and penalties, accounts being turned over for collection, and consumer ratings being impaired or damaged by disparaging or otherwise negative reports from the Bank and/or the debt collectors it turns the purportedly delinquent accounts over to for collection.

2.     Defendants NCO, CCA, and U.S. Asset Management are jointly liable with the Bank of America under the Electronic Fund Transfers Act, 15 U.S.C. §1693(a)(8), as persons "who...indirectly, hold[] an account belonging to a consumer."

2

3.    This action also seeks to remedy Defendant NCO's violations of the Fair Debt Collection Practices Act by using false accusations and insults to intimidate and coerce consumers and debtors into making payments on their actual or purported debts, and discouraging consumers and debtors' efforts to investigate the truth, correctness, or accuracy of their claimed indebtedness and to get NCO to do the same.

4.    This action also seeks to remedy Defendant CCA's violations of the Fair Debt Collection Practices Act by misleading, confusing, intimidating, and harassing consumers and debtors with multiple automated prerecorded calls and messages in order to get them to make payments on their actual or purported debt, and by failing to provide them with a debt validation notice, in order to discourage them from investigating the truth, correctness, or accuracy of their claimed indebtedness and to get CCA to do the same.

5.    Defendant Bank of America charged to Plaintiff's account monies that it claimed she had withdrawn via another bank's ATM in Brazil, along with overdraft and associated fees.

6.    Plaintiff did not obtain those monies, and timely disputed the posted charges.

7.    Plaintiff's withdrawal of the amounts Defendant Bank posted to and debited from her account was impossible because (i) contrary to her instruction prior to traveling to Brazil, Defendant blocked her card's access to her account and (ii) the amounts Defendant claimed Plaintiff withdrew were in excess of the Banco do Brazil's daily withdrawal limit.

8.    Defendant Bank of America turned Plaintiff's unpaid account for collections to, inter alia, Defendant NCO and, upon information and belief, Defendant CCA, with knowledge that Plaintiff neither did nor could owe the claimed debt and seeking to stall Plaintiff's attempts to have the Bank rectify the error.

9.     Bank of America exposed Plaintiff to aggravation, inconvenience, humiliation, and embarrassment in dealing with Defendants NCO and CCA.

10.     Defendant Bank knew or reasonably should have known that customers whose account Defendant turned over for collection would be aggravated and inconvenienced by having to deal with the debt collectors.

11.     Defendant NCO dunned Plaintiff for the purportedly owed debt, which dun directed her to dispute her debt directly with its "office" apparently located at 1804 Washington Blvd., Mailstop 450, Baltimore, MD 21230.

12.     When Plaintiff contacted NCO, its representative accused her of lying and falsely accused her of having written a bad check as the reason for the collection activity against her.

13.     On a regular basis, at least three times a month over a 6-month period, Plaintiff has been receiving automated prerecorded calls to and messages on her cell phone which mention a reference number, a callback number, and ask her to call back.

14.     On or around September 4, 2010, with the aid of her legal counsel, Plaintiff has discovered that the calls came from Defendant CCA, a debt collector separate from and unrelated to NCO.

15.     With respect to Plaintiff Solomon, CCA has failed to provide a meaningful disclosure of its identity and true business name, and has never provided a debt validation notice in violation of the FDCPA.

16.     Plaintiff believes and is informed she fell victim to a common practice by Bank of America to post charges to its customers' accounts for monies purportedly transferred but never in fact received, not to conduct any good-faith investigation, and turn such accounts over to debt

4

collectors as delinquent, despite having evidence that the EFTs were unauthorized.

17. Plaintiff believes and is informed she fell victim to a common practice by NCO to make misrepresentations, harass, browbeat, coerce, and intimidate actual and purported debtors in order to induce them to pay their actual and purported debts.

18. Plaintiff believes and is informed she fell victim to a common practice by CCA to browbeat, coerce, intimidate, and mislead debtors with auto dialer-generated calls and messages without providing the target consumer or debtor a debt validation statement and/or a meaningful disclosure of its identity, in violation of the FDCPA.

19. As a result of Bank of America's pattern or practice of wrongdoing, Plaintiff and other Bank customers have sustained damage, loss or harm including but not limited to the amounts withdrawn from their accounts by the Bank. Upon information and belief, Defendant Bank provided disparaging or other negative information on many such customers to one or more credit reporting bureau, which resulted in impaired credit ratings for such customers. Upon information and belief, Defendant Bank and other banks do this automatic reporting to various agencies, and also mail to them the banks' internal reports.

20. As a result of NCO's and CCA's pattern or practice of wrongdoing, Plaintiff and other customers of the Bank of America whose accounts the Bank and other actual or purported creditors have turned over for collection to NCO and CCA have sustained aggravation, inconvenience, humiliation, and embarrassment, and difficulty in opening other accounts in other banks.

21. Upon information and belief, Defendants' acts and omissions detailed herein continue to this day, and will go on undeterred unless stopped by this Court.

22.     Plaintiff and numerous other bank account holders are also seeking to recover exemplary damages because there is every indication that Defendants' acts and omissions complained of herein have been knowing, deliberate, willful, wanton, and malicious, or in reckless disregard of consumers' rights.  Among other things, Defendant Bank knows or reasonably should know that, when somebody is withdrawing cash from an ATM using a credit card, it is an indication of that person's undergoing a financial hardship.

23.     Plaintiff and the Class are also seeking declaratory and injunctive relief to put an end to Defendants' continuing violations of the kind alleged herein.

## PARTIES

24.     Plaintiff Morr Solomon is an individual residing in Evanston, Illinois, and hence in this Judicial District.  At all times relevant herein, Plaintiff was a checking account customer and a debit cardholder of Defendant Bank of America Corporation.

25.     Defendant Bank of America, N.A., a/k/a Bank of America Corporation ("the Bank" or "Defendant Bank"), is a corporation organized under the laws of Delaware and having a principal place of business in Charlotte, North Carolina.  Defendant provides retail banking services to millions of customers, including Plaintiff and the Class she seeks to certify herein. The Bank has more than 59 million consumer and small business relationships.  In conjunction with their checking accounts, the Bank issues its customers with debit cards.  The Bank has well over a trillion dollars in assets.  The Bank boasts the country's most extensive branch network, with more than 6,100 retail banking locations and over 18,000 ATMs covering over 30 states and the District of Columbia.  By total revenue, Defendant Bank has been estimated to be the fifth largest company in the United States.  In the first quarter of 2010, it collected a revenue of $3.2

6

billion, and in the second quarter, $3.1 billion. Defendant is a national bank, subject to the National Bank Act, 12 U.S.C. 1 et seq., and regulations promulgated by the Office of the Comptroller of Currency. Defendant Bank improperly posted to Plaintiff's account charges in the amount of withdrawals she purportedly made using a foreign bank's ATM but which she never obtained nor in any other way, directly or indirectly, benefited from. Defendant Bank either failed to investigate altogether or failed to conduct an adequate investigation into Plaintiff's claim that she did not receive any money Defendant posted to her account as electronic fund transfers. Said Defendant also assessed Plaintiff overdraft and other fees in connection with the transactions it imputed to her, and turned her account as purportedly delinquent over to Defendant NCO for collections.

26. Defendant NCO Financial Systems, Inc. ("NCO") is a debt collection company with corporate headquarters in Horsham, Pennsylvania. Defendant performs substantial business in Illinois and in this Judicial District. Defendant is engaged in the business of collecting debts originally owed, or purportedly owed, to others, using mails and telephones for that purpose. Defendant NCO has indirectly been holding Plaintiff's bank account by virtue of Defendant Bank's placing it with Defendant NCO for collection around March 2010. Upon information and belief, Defendant Bank assigned Plaintiff's account to NCO around March 2010. Defendant is jointly liable with the Bank for violations of the Electronic Fund Transfers Act because, inter alia, it indirectly holds Plaintiff's account. Also, Defendant is a debt collector within the meaning of and is liable for violations of the Fair Debt Collection Practices Act and the Illinois Collection Agency Act.

27. Defendant Collecto, Inc., d/b/a Collection Company of America a/k/a EOS CCA,

7

is a national customer care and receivable management company chartered under the laws of Massachusetts and headquartered at 700 Longwater Drive, Norwell, Massachusetts 02061, and has regional centers in Chicago, Dallas, Denver, Brockton, Massachusetts and Rochester, New York. CCA has a branch in Tinley Park, IL, and performs substantial business in Illinois and in this Judicial District. Defendant is engaged in the business of collecting debts originally owed, or purportedly owed, to others, using mails and telephones for that purpose. CCA uses automated prerecorded calls in its collection efforts. Without sending Plaintiff a debt validation letter, CCA commenced and continues to this day to make or cause to make automated prerecorded calls to Plaintiff's cell phone in an attempt to collect all or some of the debt Plaintiff purportedly owes to the Bank of America. Defendant's automated prerecorded messages identify it as "EOCCA" rather than "Collecto, Inc." or "EOS CCA," thus misleading the persons it contacts about its identity. Defendant is jointly liable with the Bank for violations of the Electronic Fund Transfers Act Defendant because it indirectly holds Plaintiff's account. Upon information and belief, Defendant Bank assigned Plaintiff's account to CCA as well as NCO. Also, Defendant is a debt collector within the meaning of and is liable for violations of the Fair Debt Collection Practices Act and the Illinois Collection Agency Act. Defendant is also liable to Plaintiff and Class Members for invasion of privacy.

_____28.    Defendant U.S. Asset Management, Inc. is a national customer care and receivable management company chartered under the laws of Massachusetts and headquartered at 700 Longwater Drive, Norwell, Massachusetts 02061. U.S. Asset Management and CCA should be treated as one and the same on the principle of veil piercing. Defendant is engaged in the business of collecting debts originally owed, or purportedly owed, to others, using mails and

telephones for that purpose. The sole officer of Defendant is Paul E. Leary, Jr. who is also the

Chief Executive Officer of Defendant CCA. Upon information and belief, Leary owns CCA and

U.S. Asset Management. All actions of Defendant CCA referred to herein were taken as an

authorized agent of U.S. Asset Management.

## JURISDICTION

29.     This Court has original "federal question" subject matter jurisdiction over this

action pursuant to 28 U.S.C. §1331 and specific statutory jurisdiction pursuant to 15 U.S.C. §§

1692k(d) and 1693m(g) and 47 U.S.C. §227(f)(3).

30.     This Court also has subject-matter jurisdiction pursuant to the Class Action

Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. §1332(d)(2), inasmuch as (i) this matter

is a class action with an amount in controversy that exceeds $5,000,000, exclusive of interest and

costs; (ii) there are thousands of Class Members; and (iii) Plaintiff and other members of the

Class are citizens of states different than Defendants' places of residence.

31.     The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant

to 28 U.S.C. §1367, as having arisen out of the same transaction or occurrence as the claims

pursuant to the Court's original jurisdiction.

32.     This Court has personal jurisdiction, and venue is proper in this District, pursuant

to 28 U.S.C. §1391(b) and (c), inasmuch as:  (i) a substantial parts of the events or omissions

giving rise to the claims, including Plaintiff's injury and loss, occurred in this District; (ii)

Defendant Bank has a significant ongoing contractual relationship with Plaintiff as a retail

9

banking customer, checking account holder, and credit/debit cardholder which was formed in this Judicial District; (iii) Defendants NCO and CCA are engaged in the collection of Plaintiff's account located in this Judicial District; (iv) Defendants generally do substantial business in this Judicial District; and (v) Defendants have sent, or caused to be sent, communications concerning the subject-matter of this controversy to Plaintiff in this Judicial District.

## GENERAL ALLEGATIONS

### A.    Defendant Bank's Failure To Investigate Customers' Claims

33.    A glaring problem Plaintiff and similarly situated customers of Defendant Bank have encountered in dealing with Defendant over debit transactions and electronic fund transfer issues is Defendant's profit-mongering activities combined with woefully inadequate oversight of electronic fund transfers ("EFTs") whose amounts it posts to customers' accounts.

34.    When a customer presents a claim that he or she did not authorize or did not in any way benefit from an EFT which was posted to his or her account, the Bank pretends that it will investigate the claim, and provides standardized, automatically generated correspondences assuring the consumer that it will conduct such an investigation and inform him or her of the results within a specific timeframe.

35.    In reality, the Bank's investigatory efforts are ether nil or perfunctory, and are not conducted in good faith.  The Bank wishes to conserve its resources on good-faith investigation and other compliance with the applicable laws and regulations.  Further, the Bank pursues its goal of maximizing its revenues from overdraft and other fee collection.

10

36.     Through an advisory letter dated September 7, 2001 and entitled "Electronic Fund Transfer Act - Investigations of Unauthorized Transactions" ("EFTA Advisory Letter"), the United States Department of Treasury, Office of the Comptroller of the Currency ("OCC") promulgated actions a financial institution should implement to ensure its investigations' compliance with the bank's EFTA obligations.

37.     The EFTA Advisory Letter expressly states that the OCC is concerned that banks are rejecting claims of unauthorized transactions "<u>solely</u> because the customer's Automated Teller Machine (ATM) card or debit card and personal identification (PIN) were used in the transaction, and the customer supplied no information indicating that the card or PIN was misappropriated." (Emphasis added.)

38.     The EFTA Advisory Letter goes on to state that, in order to assist banks in complying with EFTA and Regulation E error resolution procedures, the OCC has compiled a list of actions banks may take, and information they may consider, to determine whether a transaction was authorized.  These include: (1) documentation or written signed statements provided by the customer; (2) historical information on the customer's pattern of use (<u>e.g.</u>, time, frequency, location, and types and amounts of transactions); (3) location of the transaction in relation to the customer's residence, place of business, or normal shopping locations; (4) customer's location at the time of the unauthorized transaction; (5) problems reported by other customers regarding the access device or ATM; (6) signature information on point of sale transactions; (7) police reports; and (8) film from security cameras.

39.      As made evident by its correspondences in response to Plaintiff Solomon's

claims, Defendant Bank failed to implement and/or adhere to the EFTA Advisory Letter in its investigation process, resulting in either no investigation or inadequate investigations and improper denials of reimbursement.

**B.     Defendant Bank's Deceptive, Unfair, And Unconscionable Overdraft Practice**

40.     Another no less egregious aspect of Defendant Bank's wrongdoing is its manipulation of customers' accounts and electronic fund transfers to maximize its recovery of overdraft, non-sufficient fund, and other fees, penalties, and exactions.

41.     With electronic banking transactions being an everyday occurrence in today's economy, the custom or practice of assessing overdraft and non-sufficient fund fees, as well as other penalties and exactions, has been a major source of revenue for American banks such as Defendant Bank of America.

42.     The above-mentioned practice is essentially profit-making disguised as protection of sorts against an overdraft.

43.     In 2009, banks were estimated to rake in between $27 to $38.5 billion in overdraft charges alone.

44.     These exactions are likely to have a disproportionate impact on people in long- or short-term financial hardship.

45.     A recent study by Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of the overdraft fees are sustained by the poorest 10 percent of the U.S. banks' customer base.

12

46.     The imposition of these "fees" tends to trigger still more fees and charges as it makes it less likely that a consumer's account balance will remain in the positive territory.

47.     Over the past decade, Defendant Bank has provided many of its checking account customers with debit cards, check cards or ATM cards.

48.     Through the use of debit cards, customers engage in transactions using funds from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or by withdrawing money from their accounts at automated teller machines ("ATMs").

49.     Regardless of whether a debit card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically, and the Bank becomes notified instantaneously when the card is physically passed ("swiped") through a receiving machine.

50.     When a customer swipes a debit card, Defendant Bank is able to determine immediately whether there are sufficient funds in the customer's account to cover the attempted POS or ATM transaction. The Bank has the option to accept or decline the transaction at that time.

51.     Defendant Bank is technologically equipped to decline debit card transactions (which the Bank does if a pending transaction would exceed a pre-determined, overdraft tolerance limit for an account), or to notify customers that the particular transaction will result in an overdraft.

52.     Defendant Bank employs sophisticated software to automate its overdraft system

13

which enables the Bank to maximize the incidence of overdrafts and thus the amount of overdraft and associated fees charged per customer.

53.     While Defendant has the informational and technological capability to reject or decline to honor debit or point-of-sale (POS) transactions where it is readily apparent that the account lacks sufficient funds to execute the transactions, Defendant Bank permits such transactions to proceed, and the charges to become posted to the customer's account, predictably resulting in a negative balance and an overdraft.

54.     Instead of to routinely decline debit card transactions or warn its customers that completing the transaction would result in an overdraft fee, Defendant Bank has adopted and implemented automatic, fee-based overdraft programs, processing debit card transactions and then charging its customers overdraft fees.

55.     Defendant Bank routinely processes transactions it knows or reasonably should know will result in an overdraft and then charges its customers an overdraft fee of $25 (for the first such charge in any calendar year) or $35 (for all subsequent charges) - regardless of the amount of the transaction.

56.     In numerous other bank customers' instances, the overdraft and associated fees cost the customers hundreds of dollars, even if the actual overdraft is only by a few dollars.

57.     Customers' bank accounts may not be actually overdrawn at the time Defendant Bank charges its overdraft fees, or at the time the debit transaction takes place.

58.     Defendant Bank is interested in profit-mongering in the form of overdraft and

14

associated fees, and takes no meaningful precautions to safeguard its unsuspecting customers' accounts from being overdrawn.[1]

59. As part of its scheme, Defendant Bank, within the relevant timeframe, (i) posted the amounts of EFTs and other transactions to its customers' accounts from highest to lowest rather than either chronologically or from the lowest to the highest, in order to maximize the incidence of overdrafts and the frequency and aggregate amount of overdraft and associated fees per customer. and (ii) failed to provide a routine warning to its customers making an ATM cash withdrawal that the transaction will result in an overdraft on their account, and charges a $35 overdraft fee for each overdraft in a day.

------

[1] Unfortunately, the Bank of America does not seem to be the only "bad apple." The industry-wide abuse of overdraft fees has long been subject to notice and comment, and lawmakers have made significant legislative changes to regulate overdraft fees relating to debit card transactions. For example, on November 12, 2009, the Board of Governors of the Federal Reserve System released a final rule and official staff commentary under Regulation E, which regulates overdraft fees. Regulation E became effective January 19, 2010, and compliance is mandatory by July 1, 2010. Regulation E mandates that a bank may not assess fees or charges in connection with overdraft services for ATM and one-time debit card transactions unless the customer has affirmatively consented to-opted into-the overdraft services. Pursuant to Regulation E, after July 1, 2010, financial institutions must comply with the following before assessing fees for ATM or debit card services:

    1. Provide written notice of the bank's overdraft service, including detail about related fees and charges (this notice must be separate from other account disclosures);

    2. Give the customer a reasonable opportunity to opt-in to the overdraft service;

    3. Obtain the customer's affirmative consent; and

    4. Provide the customer with written confirmation of the consent, including a statement that the customer may revoke consent at any time.

Regulation E promises to render an industry-changing impact. But the Bank's practices alleged herein, which antecede the enactment of Regulation E, must be examined in the spirit of the Regulation and with due regard for its remedial intendment.

60.     At all times relevant herein, Defendant Bank failed to give its customers the option to decline to complete the debit transactions or provide other forms of payment.

61.     Defendant Bank fails to adequately disclose to their customers that they can opt out of the Bank's overdraft policy, thereby avoiding all overdrafts and overdraft fees.

62.     In certain cases, customers are informed that they have a positive balance when, in reality, they have already incurred a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

63.     Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available.

64.     Even when the Bank has knowledge of outstanding transactions that have already created a negative balance in a customer's account, the Bank approves, rather than declines, subsequent debit card purchases and other electronic transactions.

65.     Defendant Bank has designed, or caused to be designed, this scheme, which is perpetrated via automated processes and accompanied by standardized statements, to maximize overdraft, non-sufficient fund, and other fee revenue, including, without limitation, monthly maintenance fees which are imposed when a customer's balance falls below a certain amount.

66.     Defendant Bank has failed to post charges to a customer's account immediately as it receives them, sometimes holding charges for several or multiple business days, thereby

16

maximizing the potential for an overdraft when it posts the accumulated charges on a single date, rearranging them from the highest to the lowest amount. This delayed posting results in overdrafts, and also prevents customers from ascertaining accurate balances on their accounts.

67. By placing a customer's account on hold, Defendant Bank does not risk any costs, expenses, or other adverse monetary impact from an overdraft, which alone makes the imposition of its fixed $35 amount of overdraft fee unjustifiable, unfair, and unconscionable.

68. Thus, Defendant, through manipulation of its customers' accounts and alteration of their transaction records, maximizes penalties to its customers and unjustly enriches itself.

69. As an integral part of its scheme, Defendant creates, publishes, and disseminates, or causes to be created, published, and disseminated, contractual documents directed at consumers and containing number of substantively unconscionable terms and conditions.

70. Upon information and belief, within the relevant timeframe, Plaintiff and other consumers who opened checking accounts with the Bank were subjected to the terms of a "Deposit Agreement and Disclosures" ("the Deposit Agreement") which stated, inter alia, that the Bank of America "may" charge the customer a fee for having insufficient funds on the customer's account.

71. Defendant's above-referenced information was deceptive or misleading because, in fact, Defendant routinely charged overdraft and non-sufficient fund fees in connection with a customer's lacking sufficient funds on his or her account.

72. Upon information and belief, numerous Bank customers were subjected to a

17

preprinted, standard-form "Fee Schedule," which they were not given to sign on and which provided for, inter alia, a $35 overdraft fee and other fixed charges in connection with a customer's lacking sufficient funds on his or her account.

73.     Both the Deposit Agreement, the Fee Schedule, the "Important Information About Your Card Agreement And Disclosure" and other materials Defendant publishes and disseminates among its customers fail to inform them that they may "opt-out" of Defendant's overdraft protection service, although it is possible for them to opt out upon request.

74.     Upon information and belief, Defendant Bank's Deposit Agreement, during the relevant time period, subjected customers to an arbitration clause and a trial-by-jury/class-action waiver through which Defendant primarily intended to shield its unfair, wrongful, and unconscionable practices from judicial review and public scrutiny.

75.     Defendant's overdraft practices run counter to the letter and spirit of the administratively prescribed "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively "the Agencies").  These "best practices" recommendations provide: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

18

76. Pursuant to the "best practices" recommendations of the Agencies, "[i]njury [caused by overdraft charges] is not outweighed by countervailing benefits...This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

77. Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering the customer the opportunity for "opting out" of any overdraft programs and informing him or her, before the customer accesses funds, that a particular POS or ATM transaction will cause the customer to incur an overdraft fee.

78. Bank of America's policies make it difficult for customers to avoid injury even if they carefully track the balance on their account. In fact, the Agencies' "best practices" recommendations state that "[i]njury" resulting from such programs or policies "is not reasonably avoidable [ by the consumer]." 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

19

79. On October 6, 2009, the Center for Responsible Learning issued a report entitled "Overdraft Explosion: Bank Fees for Overdrafts Increase 35% In Two Years." That report finds found that it is now "standard procedure to automatically enroll checking account customers in [the banks'] most expensive overdraft loan program." The report also found that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit transactions and ATM withdrawals...could easily be denied for no fee." The report also found that overdraft fee amounts increased 35% from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring 5 or more overdraft fees.

80. On September 21, 2009, Defendant Bank, by way of an acknowledgment of the wrongfulness of its overdraft practices, announced plans to overhaul its overdraft policies on a going-forward basis. Thus far Defendant has failed to correct several of the unfair practices described herein, such as the re-ordering of debits to increase overdraft fees.

81. Defendant's "remedial" changes do not cure past wrongs, and do not retroactively reverse the charges wrongfully debited from the customers accounts.

82. Defendant's "remedial" changes do not indicate that Defendant will not resume its overdraft practices described hereinabove in the future.

## ALLEGATIONS SPECIFIC TO PLAINTIFF

83. At some point prior to September 2009, Plaintiff opened a checking account with Defendant Bank.

20

84.     As part of that account-opening transaction, Defendant issued, or caused to be issued, to Plaintiff a Bank of America credit/debit card that enabled her, inter alia, to access her funds and make ATM withdrawals from her account worldwide.

85.     The parties formed a bank-depositor relationship.

86.     Pursuant to the parties' arrangement, Plaintiff was to deposit, and did in fact deposit, her monies with Defendant Bank, whereas Defendant was to, and did, open an account wherein it was to maintain Plaintiff's monies prudently and carefully, and to enable Plaintiff to receive her monies from said account through, inter alia, debit transactions, ATM withdrawals, and electronic fund transfers ("EFTs").

87.     The above-described arrangement was a contract of adhesion as Defendant had knowledge, sophistication, and bargaining strength vastly superior to Plaintiff's or, for that matter, any other retail banking customer's; Plaintiff had no meaningful opportunity to bargain over the terms; and Plaintiff took Defendant's offer of a bank-depositor relationship on a "take it or leave it" basis.

88.     Plaintiff did not opt out of Defendant's overdraft program.

89.     Plaintiff did not receive any information about Defendant's overdraft policy.

90.     On or around September 8, 2009, Plaintiff went on vacation to Brazil.

91.     About two weeks prior to departure, Plaintiff telephoned Defendant Bank at the general customer service number located on the bank of her card, spoke to a representative named "Jessica," informed that person that she was going abroad and intended to use her Bank

21

of America credit/debit card, gave her travel dates, and asked that a "travel note" be placed on the card so that while in Brazil she could use her card without blocking it due to "uncommon usage," etc.

92.     Defendant Bank's placing Plaintiff's account on hold could foreseeably cause an accumulation of debits, depletion of her funds from the aggregate impact of the accumulated debits, and result in insufficient funds and overdrafts.

93.     Plaintiff did plan to use her card in Brazil, and, accordingly, took about $800 in cash with her.

94.     While traveling in Brazil, Plaintiff found out that local merchants declined or refused to accept credit cards as a means of payment.

95.     By around mid-September 2009, Plaintiff had run out of cash

96.     On September 20, 2009, Plaintiff, and, as a sheer necessity, attempted to withdraw cash from her stateside checking account with the Bank of America, using ATMs of the Banco do Brazil.

97.     Each time Plaintiff attempted to withdraw cash, she received an error message on the screen, and neither cash nor a receipt.

98.     On the same day (September 20, 2009), after her initial and repeat attempts, Plaintiff contacted Defendant Bank using the 24-hour customer service in order to communicate her predicament and be allowed to make the cash withdrawals she needed.

99.     Plaintiff was put on a long hold and transferred several times before she finally

reached a customer service representative, "Joanna," who told her that there was never a travel note put on Plaintiff's card, and because of that the card had been locked to avoid theft, and she promised to un-lock it.

100.    "Joanna" advised Plaintiff to try again the next day when the unlocking of the card would go into effect, and also to try a different bank, stating that the bank associated with the ATM Plaintiff tried to use was not recognized by the Bank of America.

101.    On September 21, 2009, Plaintiff tried an ATM associated with a different bank in a different township; but again, the same error message came on and neither cash nor a receipt came out.

102.    Plaintiff made a number of additional attempts to withdraw cash, which proved unsuccessful.

103.    At one point, Plaintiff was able to withdraw some cash, though in a significantly lesser amount than she had previously sought to withdraw.

104.    Plaintiff was aggravated, inconvenienced, and mortified by her experience and on or around September 21, 2009, again telephoned Defendant Bank. This time she spoke to a representative named "Peter."

105.    "Peter" informed Plaintiff that she was over her daily limit on cash withdrawals and that (unbeknownst to her) all the debits she attempted to make without avail were actually charged and posted to her account, which totaled around $2475, including some $63 in international transaction fees.

23

106.    "Peter" agreed to issue Plaintiff temporary credit, the only way she could use her card again the next day, and filed a claim for Plaintiff, telling her Defendant would take up to 30 days to review her claim.

107.    Plaintiff wrote down every transaction attempt she made, both successful and unsuccessful, and "Peter" told her she was cleared for further use of her card.

108.    The following day (September 22, 2009), Plaintiff made several attempts to use local ATMs to withdraw cash from her stateside account with Defendant, but again, without success.

109.    Plaintiff again contacted Defendant Bank by phone, waited on hold for about a half hour, spoke to one "Tasha" who said she did not know why the card was not working and would put a note on it and advised Plaintiff to try again.

110.    Plaintiff was eventually able to purchase travel tickets by making a MasterCard charge to her Bank of America credit/debit card, and was also able to make a cash withdrawal from an ATM, but then again, the cash-withdrawal problem recurred.

111.    Plaintiff spoke to another representative of Defendant, "Sharon," who told Plaintiff that she exceeded her daily withdrawal limit.

112.    Plaintiff informed "Sharon" that, every time she tried to take cash out and did not get any, that amount would still get posted to her account.  "Sharon" saw the previously entered note and filed a claim for Plaintiff in the amount of $1,374 or thereabout, and told Plaintiff to try again.

24

113.     Plaintiff tried again and the same error message came on and no cash came out.

114.     Plaintiff was aggravated, inconvenienced, humiliated, and embarrassed.

115.     On or around September 30, 2010, Plaintiff returned home, contacted Defendant Bank, spoke to "Shanda," she told her to go over all her transactions, and filed a claim.

116.     In either late October or November 2009, or thereabout, Plaintiff received three similar-looking, automatically generated notices from Defendant Bank, dated October 6, October 15, and October 22, 2009, respectively and referencing her September 28th, September 21st, and October 13th claims, respectively.[2]

117.     All three form notices bore Defendant Bank's logo and stated uniformly:

DEAR MORR SOLOMON:

Thank you for the information you supplied regarding the charge(s) in question. Bank of America is proceeding with the dispute resolution process on your behalf...

****

We have submitted your dispute on the above transaction(s) to the merchant's bank....

****

The merchant(s) and/or the merchant's bank(s) now have the opportunity to

---

[2]      As these and multiple other documents referenced herein contain sensitive financial and other private and confidential information, Plaintiff does not attach them as exhibits to her Complaint but is willing to produce them pursuant to a protective order to be entered in this case.  Besides, Defendant should have most, if not all, the documents mentioned herein as part of its business records.

present additional information to counter your dispute.  **This process can take up to 45 days**.  If we receive feedback from the merchant or their bank, we will notify you by mail of the results.  (Emphasis added.)

118.    On or around October 6, 2009, Plaintiff received a letter from the Bank of America stating that one of the temporary credits was reversed.

119.    On or around October 13, 2009, Plaintiff called the number set forth in the letter, spoke to two representatives of Defendant, "Damen Clark" and "Nick Smedly", and discovered that the remaining balance on her account was only $731 or thereabout.

120.    Plaintiff was shocked, unnerved, and distraught by her discovery, was aggravated and inconvenienced by the lengthy hold she was subjected to on the phone by Defendant's customer service, and made an in-person visit to a branch in Evanston, where she discussed the matter with the branch manager, "Dolores Raya."

121.    Plaintiff and Ms. Raya went over the transactions for several hours, in consequence of which review Ms. Raya opined that there may have been claims which Plaintiff either forgot to mention or for some reason did not go through.

122.    Ms. Raya offered to file yet another "claim" for Plaintiff, explaining it was the only option.  She filed that claim by calling "Laura Feudale."

123.    Plaintiff was aggravated by her experience and withdrew the remainder of her money, hoping for the best.

124.    In either late October or November 2009 and December 2009, or thereabout, Plaintiff received three similar-looking form notices from Defendant Bank's "Dispute

26

Resolution Services" division, dated October 26, December 7 and 11, 2009 respectively, which bore Defendant's logo and stated uniformly:

> Dear MORR SOLOMON
>
> After conducting a thorough investigation of the above-reference [sic] claims, it has been determined that no error has occurred in this instance.
>
> Our records show the transaction activity in question was authorized and posted correctly to your account.

125.    The notices further informed Plaintiff that claims previously made for her would be reversed along with the temporary credit previously issued, putting her account into the "negative."

126.    The October 26th notice was in reference to the claim Plaintiff filed through "Shanda" on or around September 30, 2009; The December 7th notice was in reference to the claim Plaintiff filed through "Sharon" on or around September 28, 2009; and the December 11th notice was in reference to the claim Plaintiff filed through "Peter" on or around September 21, 2009.

127.    On or around November 3, 2009, Plaintiff wrote and mailed to Defendant Bank a letter protesting its determination on her September 30, 2009 claim and, among other things, explained her cash withdrawal attempts in Brazil were unsuccessful.

128.    On or around December 12, 2009, Plaintiff called to find out why those claims were reversed, spoke to "Mike" in Defendant's Tampa location, and told him about her Brazil experiences.

129.     "Mike" only said Plaintiff could request a more detailed analysis of Defendant's

investigation of her claims, and it would take from 5 to 7 business days to get it.  Plaintiff did

request a detailed analysis for all the rejected claims.

130.     On December 12, 2009, Plaintiff wrote and mailed a letter disputing Defendant's

determination on her September 28, 2009 claim, explaining her problems in Brazil, demanding

to see proof of the amounts charged to her account, and refusing to pay the purported debt.

131.     On December 14, 2009, Plaintiff received from Defendant Bank a notification of

claim and temporary credit reversal whose layout and wording was identical to the ones dated

December 7th and 11th.  The December 14th letter referenced Plaintiff's October 13, 2009 claim.

132.     On or around December 14, 2009, and on December 17, 2009, Plaintiff received

letters from Defendant Bank that were worded differently from the earlier ones:

> ...We have reconsidered your claim.  The ATM owner shows no error on this
> transaction.  This claim will therefore remain denied.

Both letters referenced Plaintiff's September 28th claim Plaintiff filed through "Sharon."

133.     On or around December 19, 2009, Plaintiff wrote and mailed to Defendant a

letter disputing its determination on her September 21, 2009 claim, wherein she denied all

charges, demanded to see proof, and refused to pay the purported debt.

134.     On or around December 21, 2009, Plaintiff telephoned Dolores Raya, and told

her about the form notices she had been getting.  Ms. Raya referred Plaintiff to the Bank of

America "Advocate" executive phone number.

28

135.    Plaintiff called the "Advocate" number and spoke to "Lorraine," detailing all of the events that took place in Brazil and stating the Bank charged her for cash Plaintiff never received and actually owes her money.

136.    The "Advocate," Lorraine, offered no help to Plaintiff and became very rude to her on the phone.  Plaintiff felt so discouraged that she postponed further inquiry until after the holiday season.

137.    On December 25, 2009, Plaintiff wrote and mailed a letter to Defendant Bank, again disputing its determination on her September 28, 2009 claim, denying all charges, demanding to see proof, and refusing to pay the purported debt.

138.    On or around February 1, 2010, Plaintiff decided to get her Brazilian friend to contact the Banco do Brazil to obtain proofs from that bank that she did not receive any cash from her unsuccessful attempts to withdraw.

139.    Plaintiff's friend spoke to a Banco do Brazil manager who asked for an e-mail with all the transaction numbers.

140.    On or around February 24, 2010, Plaintiff's friend in Brazil received an e-mail from the bank manager stating he looked into the bank records to verify whether the transactions cored, and found they did not.  He also stated that the daily limit for all Banco do Brazil ATM machines is 1,000 Reals, which is less than the amounts Defendant Bank posted to Plaintiff's account as her purported ATM cash withdrawals, and which makes it impossible for the transactions to have occurred, since Defendant Bank claimed she took in excess of the daily

limit on multiple days. Plaintiff's friend forwarded that information to Plaintiff.

141. On or around March 17, 2010, Plaintiff called the Bank of America Advocate executive number and again spoke with "Lorraine." After Plaintiff told her about the Banco do Brazil manager's communication, Lorraine told her she would speak with a different person about this matter and get back to her.

142. On or around April 5, 2010, Plaintiff unexpectedly received a standard-form letter from Defendant NCO Financial Systems, Inc. dated March 26, 2010, which purported to inform Plaintiff that the Bank of America had sent her account to collections for the sum of $5,448.51, and threatened that if Plaintiff did not pay that amount, a judgment would be entered against her.

143. Defendant Bank had not provided Plaintiff with any advance notice or notification that it did or would turn Plaintiff's account over for collection to NCO or any other debt collector.

144. On the same day, April 5, 2010, Plaintiff wrote and sent by regular first-class mail a letter to Defendant NCO in which she set forth the registration code NCO issued her with, and disputed the alleged debt and demanded proof of the charges.

145. Plaintiff called the number set forth in the NCO dunning letter and spoke to a representative.

146. Plaintiff did her best to explain her situation; however, Defendant's representative cut her off while she was still speaking, accused Plaintiff of lying, and stated the

reason she owed that money was that she had written a bad check.

147.    On or around April 19, 2010, Plaintiff again called the Advocate executive

number and again spoke with "Lorraine."

148.    Plaintiff asked why her account was sent to collections, and told "Lorraine" again

that the withdrawals were impossible due to the Banco do Brazil's 1,000 Real per diem

limitation.

149.    Plaintiff informed "Lorraine" that the Banco's website states that limitation, too,

and offered to forward to the attention of "Lorraine," via e-mail, the website links and the

manager's communication.

150.    Plaintiff became distraught, was reduced to tears, and cried while she was

speaking with "Lorraine."

151.     "Lorraine" merely said that she would look into the matter and get back to

Plaintiff, but did not even provide an e-mail address for Plaintiff to provide the information she

offered in proof of her claims.

152.    On July 12, 2010, Plaintiff received a letter from Defendant which stated:

Dear MORR SOLOMON:

Thank you for your recent inquiry concerning the above-referenced ATM/Check
Card activity.  When it comes to the area of dispute investigations, Bank of
America conducts thorough research to resolve these types of issues.

We have concluded our investigation and have determined that no error has
occurred in this instance.

Our records show the transaction activity in question was authorized and posted, or billed, correctly to your account. We relied on the enclosed documents to make our decision.

Therefore, we are unable to credit your account, thus closing this dispute.

153.    Enclosed with Defendant's July 12th communication was a collection of confusing, barely intelligible matter which Plaintiff neither did nor could comprehend.

154.    All of Defendant Bank's letters were automatically generated, contained standardized, preprinted verbiage, and made no suggestion that Plaintiff may seek reconsideration and provide any evidence that she might have in support of her claims.

155.    Upon information and belief, Defendant Bank turned over, caused to be turned over, or assigned Plaintiff's account to Defendant CCA.

156.    In the alternative, upon information and belief, Defendant NCO turned over, caused to be turned over, or assigned Plaintiff's account to Defendant CCA.

157.    On a regular basis, at least 3 times a month during a 6-month period, Plaintiff has been receiving on her cell phone strange calls and automated prerecorded messages whose wording runs thus:

This is a message for Morr Solomon. If you are not Morr Solomon, please hang up and call 8773840290 to remove this phone number from our records. If you continue to listen to this message you are acknowledging that you are Morr Solomon. This message contains personal and private information. [A three-second pause follows and then the message resumes.] This is EOCCA, a collection agency, and this is an attempt to collect a debt. Any information obtained will be used for that purpose. Please contact us about this important business matter at 8773840290. When calling, please reference account number 12013434.

158.    These auto-dialed contacts have confused, embarrassed, and frightened Plaintiff.

159.    On September 4, 2010, Plaintiff's counsel's research disclosed that the calls were made by Defendant CCA.

160.    Plaintiff has received no written correspondence from CCA or, for that matter, from NCO or the Bank that would indicate CCA's connection to Plaintiff's debt.

161.    Other than the disputed matter with the Bank of America, Plaintiff has no debt.

162.    Defendant Bank refused or declined to consider the evidence that Plaintiff had been able to obtain from the Banco do Brazil, which showed the impossibility of the withdrawals posted to Plaintiff's account due to the Banco do Brazil's daily cash withdrawal limit.

163.    When, in her conversation with "Lorraine" on or around April 19, 2010, Plaintiff offered to send in the correspondence she received from Brazil that evidenced the non-occurrence of the ATM withdrawals and the Banco do Brazil's daily withdrawal limits, Lorraine said that it was "not necessary."

164.    Defendant Bank failed to consider the evidence that the posting of the purported ATM withdrawals occurred while Defendant put Plaintiff's account on hold (contrary to her pre-departure instructions).

165.    Defendant Bank failed to consider Plaintiff's good standing as an account holder with the Bank of America prior to her ATM problems in Brazil.

166.    Defendant failed to consider whether video recordings were available for the

33

locations at which Plaintiff used her ATM.

167.    Defendant Bank's December 7th and 11th notices came in at a significantly later date than within 45 days from Defendant's October 6th and 15th notices, and certainly from the dates on which Plaintiff had made her September 21st and 28th claims.  Likewise, Defendant's December 14th notice came in much later than 45 days from Plaintiff's October 13th claim.

168.    Plaintiff was  personally injured by Defendant bank's practices as detailed hereinabove.  Defendant Bank posted to Plaintiff's account EFTs from which she did not benefit, either directly or indirectly, allowed the postings to occur while it blocked Plaintiff's account, and assessed multiple overdraft, non-sufficient fund, and other fees and charges in connection with ATM withdrawals that did not dispense the monies.  Defendant posted Plaintiff's EFTs and other transactions not chronologically  but from the highest to the lowest amount pursuant to its standard, uniform practice of maximizing the incidence of overdrafts and the frequency and aggregate amount of overdraft and associated fees per customer.  Nor did Defendant provide a good-faith investigation of Plaintiff's claims.

169.    Defendant's failure to safeguard Plaintiff's account from depletion by EFTs that did not transfer any monies to Plaintiff but instead, along with Defendant's overdraft and associated fees, exhausted her account and resulted in the above-mentioned fees and charges deprived Plaintiff of significant funds, and caused her ascertainable monetary losses and damages, mental anguish, emotional distress, aggravation, inconvenience, humiliation, and embarrassment.

170.    Plaintiff is also aggrieved by the conduct of Defendants NCO and CCA, the debt

34

collectors to whom the Bank turned her allegedly delinquent account over, or caused it to be turned over, for collection. Whereas NCO's representative's demeanor and statements to Plaintiff on the phone overshadowed and was inconsistent with Plaintiff's right to dispute her alleged debt and other matters set forth in the debt validation notice, CCA has failed to provide such notice at all, and furthermore, has failed to provide a meaningful disclosure of its identity and its true business name. CCA has also vexed, annoyed, harassed, and intimidated Plaintiff with multiple auto-dialed calls to her cellular telephone number without her consent and in the absence of an established business relationship between Plaintiff and CCA. Plaintiff further believes and is informed that NCO communicated with CCA about her purported debt to the Bank and that CCA either knew or should reasonably have known that Plaintiff did not owe the debt and/or Plaintiff sent correspondence to NCO and the Bank disputing her debt, demanding strict proof of the charges, and refusing to pay any portion thereof.

171. As detailed below, Plaintiff asserts claims against Defendant Bank for violations of the Electronic Fund Transfers Act, breach of contract, breach of the covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, breach of fiduciary duty, emotional distress, and for violations of various states' consumer protection statutes.

172. In connection with the credit reporting and collection practices of Defendants NCO and CCA (and U.S. Asset Management, as essentially one and the same entity with CCA), Plaintiff asserts a claim under the Fair Debt Collection Practices Act and the Illinois Collection Agency Act.

173. Upon information and belief, Defendant NCO has not ceased its collection

activity notwithstanding the fact that Plaintiff put NCO on notice of her debt dispute via letter within 30 days after receiving NCO's March 26, 2010 notice.  Plaintiff keeps receiving automatic messages on her cell asking her to return the call and referencing a number.  Plaintiff believes and is informed that Defendant NCO, acting either on its own or at the behest of Defendant Bank, has turned Plaintiff's account over and/or caused CCA to instigate a collection activity against Plaintiff via these calls in order to get her to make payments on her purported debt.  Plaintiff also has reasons to believe that NCO communicated with CCA about her purported debt to the Bank and that CCA either knew or should reasonably have known that Plaintiff did not owe the debt and/or Plaintiff sent correspondence to NCO and the Bank disputing her debt, demanding strict proof of the charges, and refusing to pay any portion thereof.

174.    Plaintiff has been checking her credit score routinely in apprehension lest Defendants provide disparaging or negative information about her to one or more credit reporting bureaus.

175.    On May 17, 2010, Plaintiff contacted and retained the law firm of Berton N. Ring, P.C. in Chicago, Illinois as her legal counsel, and has expressly assigned all claims for attorneys' fees to Berton N. Ring, P.C.

176.    Upon information and belief, each of Plaintiff's claims with Defendant Bank was reduced to writing and communicated to the Bank.

177.    Both Plaintiff's claims and correspondences to the Bank sufficiently informed

Defendant of Plaintiff's identity and reasonably described the unfair or deceptive practice of Defendant and the injury she suffered.

178.    At least 30 days prior to the filing of Plaintiff's Class Action Complaint, Plaintiff's counsel Berton N. Ring sent written correspondence, via certified mail and other means, to Defendant Bank at P.O. Box 53137, Phoenix, AZ 85072-9317, which sufficiently informed Defendant of Plaintiff's identity and reasonably described the unfair or deceptive practice of Defendant and the injury she suffered.

## CLASS ACTION ALLEGATIONS

179.    Plaintiff Morr Solomon brings this action on her own behalf and on behalf of Classes defined as follows:

### Subclass A

All persons residing in the United States of America who, at any time during the period commencing on the date one year prior to the date of filing of this action and ending on the date of class certification, had an account at Bank of America accessible through a Bank of America debit card, check card, or any other device, and either (i) paid a charge posted to their bank account in connection with an electronic fund transfer from which they did not benefit, which transaction they timely disputed with the Bank of America, and the Bank upheld the charge as proper; (ii) paid one or more overdraft fees, non-sufficient fund fees, returned item fees, or similar fees or penalties assessed to a person's account within 5 business days after a Bank of America debit card transaction either occurred or posted to the holder's account; or (iii) paid one or more over-the-limit fees or similar fees that were assessed for an account cycle in which a Bank of America debit card transaction either occurred or posted to the person's account. ("Debit card" refers to debit card, check card, or any other bank card used for debit purchases, bearing the Bank's logo or brand, including those issued by affiliates or subsidiaries of the Bank.)

**Subclass B**

All persons residing in the United States who, at any time during the period commencing on the date one year prior to the date of filing of this action and ending on the date of class certification, (1) had an account turned over for collection to Defendant NCO Financial Systems, Inc., and (2) NCO either or both (i) made false representations to that person about the nature, reason, status, or amount of that person's debt, (ii) intimidated or harassed that person, or (iii) engaged in a collection activity against that person even after that person had notified it in writing about a debt dispute within 30 days from the date NCO had initially contacted that person.

**Subclass C**

All persons residing in the United States who, at any time during the period commencing on the date one year prior to the date of filing of this action and ending on the date of class certification, (1) had an account turned over for collection to Defendant Collecto Inc. d/b/a EOS CCA and (2) CCA either or both (i) failed to provide a debt validation notice in violation of the Fair Debt Collection Practices Act or (ii) without the called persons' consent and in the absence of an established business relationship with them, made multiple automated prerecorded phone calls within a 12-month period identifying itself as "EOCCA" or anything else other than its true business names, "Collecto, Inc." and "EOS CCA."

**Subclass D (Statutory Fraud Claim under similar state statutes)**:

All customers of Bank of America, N.A. residing in Illinois, Arizona, California, Colorado, Florida, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia, and Washington (1) to whose accounts the Bank posted amounts of electronic fund transfers the customers did not in any way benefit from, along with any overdraft fees, non-sufficient funds fees, transaction fees, monthly maintenance fees, and other charges; (2) who made claims in connection with such postings to the Bank; and (3) whose claims the Bank denied due to failure to investigate or inadequate investigation and/or reported the affected customers' accounts as delinquent and/or turned such accounts over to third parties for collections; (4) at any time during the applicable statute of limitations period preceding the filing of this action up to the date of class certification; (5) which customers sustained actual monetary loss or harm as a direct and proximate result of the Bank's failure to safeguard

38

their accounts, properly monitor electronic fund transfers, and failure to investigate or inadequate investigation of claims in connection with electronic fund transfers which the complaining customers did not benefit from.

This Class definition may be expanded or narrowed by amendment or an amended complaint subject to information to be obtained upon further investigation and discovery. Specifically excluded from the Class as defined herein are Defendants, their officers, directors, managers, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, management-level employees, joint ventures, entities controlled by Defendants, their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this case, and any member of the Judge's immediate family.

180. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of hundreds, if not thousands of Bank of America customers to whose accounts the Bank improperly posted charges in connection with EFTs from which the customers did not in any way benefit and whose claims in connection with such postings the Bank failed to investigate at all or failed to investigate adequately. The precise number of members in the Class is within Defendants' custody and control. Specifically, Defendants' and other involved entities' business records can and will demonstrate, inter alia, (i) which bank customers were posted charges to their accounts in connection with EFTs they did not benefit from, (ii) whether the Bank investigated their claims in connection with such postings and debits, (iii) whether the Bank classified those accounts as delinquent and turned them over for collections to NCO, CCA, or other third-party debt collectors, and (iv) the dollar amounts the customers' accounts were mulcted of. Based

39

on reasonable estimates, the numerosity requirement is easily satisfied for the Class. Electronic fund transfers are an everyday occurrence in an average bank customer's life, the Bank of America has tens of thousands of customers nationwide, and NCO is one of the largest debt collectors in the country.

181. **Common Questions Predominate**: Plaintiff's allegations give rise to common questions that predominate in this class lawsuit, including, without limitation:

a. Whether Defendant Bank posted charges to its customers' accounts for electronic fund transfers which, based on its internal guidelines, it should not have allowed to occur.

b. Whether Defendant Bank turned customers' accounts over for collection as delinquent with knowledge or notice that their alleged debt was from debit transactions and electronic fund transfers which neither did not could occur.

c. Whether Defendant Bank had knowledge that electronic fund transfers could not have occurred and/or the customers to whose account they were posted did not or could not benefit from such transfers.

d. Whether Defendant Bank actually investigated claims in connection with electronic fund transfers it posted to its customers accounts, and if so, whether Defendant's investigation complied with the letter and spirit of the Electronic Fund Transfers Act and Regulation E.

e. Whether Defendant Bank retained the funds it posted to and debited from its customers' accounts in connection with electronic fund transfers they claimed they did not benefit from.

f. Whether Defendant Bank complied with the documentation, timely-investigation, good-faith investigation, and timely-notification requirements of the Electronic Fund Transfers Act.

g. Whether Defendant Bank had a pattern or practice of failing to provide a refund or credit for an improperly posted or debited amount(s).

40

h.  Whether Defendant Bank failed to clearly disclose and/or refuses to allow its customers to opt out of its overdraft policy.

i.  Whether Defendant Bank failed to obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees.

j.  Whether Defendant Bank failed to alert its customers that a debit transaction would trigger an overdraft fee and failed to provide a reasonable opportunity for canceling such transaction.

k.  Whether Defendant Bank manipulated debit transactions so as to increase the incidence of overdraft liability subjecting the holder to one or more overdraft fees, with the object of maximizing the number of overdrafts and the frequency and aggregate amount of overdraft fees.

l.  Whether Defendant Bank manipulated and reordered debits and other transactions whose amounts it posted to its customers' accounts from highest to lowest in order to maximize the incidence of overdrafts and the frequency and aggregate amount of overdraft and related fees per customer.

m.  Whether Defendant Bank failed to provide its customers with true or accurate balance information and account status.

n.  Whether Defendant Bank charged overdraft fees whose amounts do not bear any commercially reasonable relationship to the actual costs and risks of covering debit and transactions resulting in overdrafts and insufficient funds.

o.  Whether Defendant Bank's written agreements and other documentation of its relationship with its debit cardholders are adhesionary and unconscionable and are the product of unequal bargaining strength and unequal knowledge and sophistication.

p.  Whether Defendant Bank violated substantially similar state consumer protection laws.

q.  Whether Defendant NCO engages in a collection activity even after receiving an actual or purported debtor's written dispute notice within 30 days after NCO initially contacted that debtor.

41

r.   Whether Defendant NCO engages in harassing behavior and or lying to/misleading actual or purported debtor about the nature, cause, or status of their actual or purported debt.

s.   Whether Defendant CCA engages in a collection activity without providing a debt validation notice in violation of the Fair Debt Collection Practices Act.

t.   Whether Defendant CCA makes, or causes to be made, multiple automated prerecorded phone calls within a 12-month period wherein it fails to provide a meaningful disclosure of its identity or its true business name.

u.   Whether Defendant CCA makes, or causes to be made, auto-dialed calls to telephone numbers assigned to cell telephones without prior consent from or an established business relationship with the called persons.

182.   **Typicality**:   Plaintiff's claims are typical of the claims of the Class Members because Defendants engaged in uniform practices or lines of conduct described above. Each Class Member Ms. Solomon seeks to represent was mulcted of sums of money purportedly due to electronic fund transfers, transaction fees, and, if those postings depleted his or her account, overdraft and NSF charges. The lowering of the account balance due to the improper postings generated monthly maintenance fees, too. Each Class Member made a claim with the Bank which the latter denied for either a total failure to investigate or a perfunctory or otherwise inadequate, bad-faith investigatory effort. Each Class Member received standardized communications from Defendant Bank to the effect that there was an investigation, it was thorough, and the postings were properly made. Defendant Bank also generated and disseminated standardized monthly statements to its customers which included the charges posted in connection with the objectionable EFTs. With respect to Plaintiff's Class claims against NCO, CCA, and U.S. Asset Management, each Class Member was exposed to Defendants' improper practices in violation of the Fair Debt Collection Practices Act and, with

respect to CCA and U.S. Asset Management, improper auto-dialed calls to Plaintiff and other consumers in violation of the FDCPA and the Telephone Consumer Protection Act.

183. **Adequacy of Representation**:    Plaintiff will fairly and adequately protect the interests of the Class Members, are committed to the vigorous prosecution of this action, have retained counsel that are competent and experienced in consumer class litigation, and have no interests antagonistic to or in conflict with those of the Class.  For these reasons, the named Plaintiff is an adequate class representative.

184. **Superiority**:   A class action is superior to any other available methods for the fair and efficient  adjudication of this controversy.  The interests of justice would be furthered by adjudicating the claims of all Class Members in a single forum. Among other things, joinder of all members of the Class is impracticable.  Further, because the aggregate amount of overdraft, transaction, monthly maintenance, or other fees posted in connection with an objectionable EFT in an individual case is relatively small,  the expense and burden of individual litigation would make it impossible for the Class Members to individually seek redress for the harm done to them.  As a result, Class Members have no interest in prosecuting and controlling individual actions.  There are no known individual Class Members who are interested in individually prosecuting and controlling separate actions.  Indeed, Class Members are unlikely to be even aware that they have been improperly billed and defrauded in the manner detailed herein.  It has been noticed in various contexts, e.g., telephone bill charges, that the small amounts of the charges improperly included in a standard-form periodic statement, coupled with little or no information as to their legitimacy, help the perpetrator evade early detection.  The prosecution of separate actions by individual members of the Class

would create a risk of inconsistent or varying adjudications, which can result in the establishment of incompatible standards of conduct for Defendants. Individual litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The class-action adjudicatory mechanism provides the benefits of resolution of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. Nor does this case present any unusual management difficulties. Among other things, Defendant Bank, as part of its business records, maintains data in digital and other form that enables it to calculate amounts it posts to customers' accounts in connection with EFTs. (However, any variations in the amounts of individual damages are not a barrier to class certification.) Defendants CCA and U.S. Asset Management have the names and telephone numbers of the actual and purported debtors they have called and will call as part of digitized data in their business records. These Defendants' records also reflect the frequency of the calls, the time of day or night they have been made, the type of phone number they are auto-dialed to (cellular, residential line, etc.), and the script of the prerecorded messages. Defendants' records also reflect which actual and purported debtors have been served with debt validation notices. Given the uniform policy and practices at issue herein, Plaintiff anticipates no serious obstacles to the management of this litigation as a class action.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

185.    Throughout the Class Period, Defendant Bank posted to its customers' accounts amounts in connection with EFTs they did not benefit from, and concealed from them its practice of failing to investigate their claims altogether or failing to investigate their claims adequately and in good faith in keeping with EFTA and Regulation E.

44

186. The above-described conduct is an insidious practice that is difficult for an average person to apprehend.

187. Defendant Bank has furthered its practice with standardized representations that its investigatory efforts were thorough and the postings were proper, which failed to disclose that in fact Defendant Bank either fails to investigate claims altogether or provides only a cursory and inadequate investigation.

188. In fact, Defendant either did not investigate the aggrieved customers' claims at all, or failed to investigate them in a meaningful fashion.

189. Defendant NCO's practice of misleading consumers and debtors about the nature, cause, or status of their actual or purported debt, as well as Defendant CCA's practice of not providing a debt validation letter and not disclosing in its collection calls its identity and real business name, has the purpose and effect of discouraging or preventing victimized consumers from making a timely inquiry, discovering the violation, and timely asserting a claim in connection therewith.

190. Based on the insidious nature of Defendants' conduct as described above, with respect to Plaintiff and the persons she seeks to represent on a Class-wide basis, all applicable statutes of limitations have been tolled and Defendants are estopped from relying thereon.

191. The relatively small amounts of overdraft, non-sufficient funds, and other fees posted to Defendant's customers' accounts in connection with the objectionable EFTs, along with the standard form of the written communications including them, combine and are

intended to induce reliance in the legitimacy and propriety of the debits, so that numerous customers fail to raise a claim. The re-ordering of transactions from the highest to the lowest amount is also difficult to apprehend.

192.    With respect to Plaintiff and the Class she seeks to represent, as a result of Defendant Bank's false or misleading representations and material omissions, all applicable limitations periods were tolled until when Plaintiff first discovered, in either late October or November 2009, that Defendant Bank failed to investigate her claims altogether or failed to conduct adequate investigation into her claims, and failed to comply with EFTA's time-limits.

193.    Also with respect to Plaintiff and the Class, any applicable limitations periods have been tolled, and Defendants are estopped from relying thereon, because Defendant Bank had superior knowledge and capability as to whether to allow an electronic fund transfer to occur and whether its account-safeguarding and claims investigation practices were adequate. This information was withheld from Plaintiff and the Class, who relied on the Bank to safeguard their accounts from any improper postings and meaningfully investigate their claims of improper postings in connection with EFTs.

## CAUSES OF ACTION

### COUNT I
### Violations of the Electronic Fund Transfer Act

194.    Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1 through 193 as though fully set forth herein. This Count is brought on behalf of Subclass A.

195.     Section 910 of the EFTA provides, in relevant part:

Liability of financial institutions

(a) Action or failure to act proximately causing damages

...[A] financial institution shall be liable to a consumer for all damages
proximately caused by–

(1) the financial institution's failure to make an electronic fund transfer, in
accordance with the terms and conditions of an account, in the correct amount
or in a timely manner when properly instructed to do so by the consumer...

15 U.S.C. §1693h (2010).

196.     Section 906 of EFTA provides, in relevant part:

Documentation of transfers

(a) Availability of written documentation to consumer; contents

For each electronic fund transfer initiated by a consumer from an electronic
terminal, the financial institution holding such consumer's account shall, directly
or indirectly, at the time the transfer is initiated, make available to the consumer
written documentation of such transfer. The documentation shall clearly set
forth to the extent applicable–

(1) the amount involved and date the transfer is initiated;

(2) the type of transfer;

(3) the identity of the consumer's account with the financial institution from
which or to which funds are transferred;

(4) the identity of any third party to whom or from whom funds are transferred;
and

(5) the location or identification of the electronic terminal involved...

15 U.S.C. §1693d (emphasis added).

197.    Section 908 of the Act provides:

Error resolution

(a) Notification to financial institution of error

If a financial institution, <u>within sixty days</u> after having transmitted to a consumer documentation pursuant to section 1693d(a), (c), or (d) of this title or notification pursuant to section 1693d(b) of this title, receives oral or written notice in which the consumer--

(1) sets forth or otherwise enables the financial institution to identify the name and account number of the consumer;

(2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to section 1693d(b) of this title, the consumer's account, contains an error and the amount of such error; and

(3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred, the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer <u>within ten business days</u>. The financial institution may require written confirmation to be provided to it within ten business days of an oral notification of error if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent. A financial institution which requires written confirmation in accordance with the previous sentence need not provisionally recredit a consumer's account in accordance with subsection (c) of this section, nor shall the financial institution be liable under subsection (e) of this section if the written confirmation is not received within the ten-day period referred to in the previous sentence.

(b) Correction of error; interest

If the financial institution determines that an error did occur, it shall promptly, but in no event more than one business day after such determination, correct the error, subject to section 1693g of this title, including the crediting of interest where applicable.

(c) Provisional recredit of consumer's account

If a financial institution receives notice of an error in the manner and within the time period specified in subsection (a) of this section, it may, in lieu of the requirements of subsections (a) and (b) of this section, within ten business days after receiving such notice provisionally recredit the consumer's account for the amount alleged to be in error, subject to section 1693g of this title, including interest where applicable, pending the conclusion of its investigation and its determination of whether an error has occurred. Such investigation shall be concluded not later than forty-five days after receipt of notice of the error. During the pendency of the investigation, the consumer shall have full use of the funds provisionally recredited.

(d) Absence of error; finding; explanation

If the financial institution determines after its investigation pursuant to subsection (a) or (c) of this section that an error did not occur, it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur. The financial institution shall include notice of the right to request reproductions with the explanation of its findings.

(e) Treble damages

If in any action under section 1693m of this title, the court finds that--

(1) the financial institution did not provisionally recredit a consumer's account within the ten-day period specified in subsection (c) of this section, and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error; or

(2) the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation,

then the consumer shall be entitled to treble damages determined under section 1693m(a)(1) of this title.

(f) Acts constituting error

For the purpose of this section, an error consists of--

(1) an unauthorized electronic fund transfer;

(2) an incorrect electronic fund transfer from or to the consumer's account;

(3) the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included;

(4) a computational error by the financial institution;

(5) the consumer's receipt of an incorrect amount of money from an electronic terminal;

(6) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this subchapter; or

(7) any other error described in regulations of the Board.

15 U.S.C. 1693f.

198.    EFTA's Section 903 provides, in relevant part:

Definitions

As used in this title–

****

(6)     the term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone...

****

(11)    [T]he term "unauthorized electronic fund transfer" means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit, but the term does not include any electronic fund transfer (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, ...or (c) which constitutes an error committed by a financial institution.

15 U.S.C. §1693a(6) and (11).

199.    Section 909 of the Act contains a limitation upon a consumer's liability in

connection with an unauthorized EFT:

Consumer liability

(a) Unauthorized electronic fund transfers; limit

A consumer shall be liable for any unauthorized electronic fund transfer involving the account of such consumer only if the card or other means of access utilized for such transfer was an accepted card or other meanas [FN1] of

51

access and if the issuer of such card, code, or other means of access has provided a means whereby the user of such card, code, or other means of access can be identified as the person authorized to use it, such as by signature, photograph, or fingerprint or by electronic or mechanical confirmation. In no event, however, shall a consumer's liability for an unauthorized transfer exceed the lesser of--

(1) $50; or

(2) the amount of money or value of property or services obtained in such

unauthorized electronic fund transfer prior to the time the financial institution is notified of, or otherwise becomes aware of, circumstances which lead to the reasonable belief that an unauthorized electronic fund transfer involving the consumer's account has been or may be effected. Notice under this paragraph is sufficient when such steps have been taken as may be reasonably required in the ordinary course of business to provide the financial institution with the pertinent information, whether or not any particular officer, employee, or agent of the financial institution does in fact receive such information.

...[T]he consumer's liability under this subsection in any such case may not exceed a total of $500, or the amount of unauthorized electronic fund transfers which occur following the close of two business days (or such longer period) after the consumer learns of the loss or theft but prior to notice to the financial institution under this subsection, whichever is less.

(b) Burden of proof

In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) of this section have been met, and, if the transfer was initiated after the effective date of section 1693c of this title, that the disclosures required to be made to the consumer under section 1693c(a)(1) and (2) of this title were in fact made in accordance with such section.

(c) Determination of limitation on liability

In the event of a transaction which involves both an unauthorized electronic fund transfer and an extension of credit as defined in section 1602(e) of this title pursuant to an agreement between the consumer and the financial institution to extend such credit to the consumer in the event the consumer's account is overdrawn, the limitation on the consumer's liability for such transaction shall be determined solely in accordance with this section.

(d) Restriction on liability

Nothing in this section imposes liability upon a consumer for an unauthorized electronic fund transfer in excess of his liability for such a transfer under other applicable law or under any agreement with the consumer's financial institution.

(e) Scope of liability

Except as provided in this section, a consumer incurs no liability from an unauthorized electronic fund transfer.

[FN1] So in original. Probably should be "means".

15 U.S.C.A. § 1693g.

200.    Defendant's posting to Plaintiff's account of monies Plaintiff neither actually received nor could have received due to the withdrawal amount limitations constituted an "unauthorized electronic transfer" within the meaning of 15 U.S.C. §§ 1693a(11) and 1693f(f)(1) or other "error" within the meaning of 15 U.S.C. §1693f(f).

201.    Neither Plaintiff nor the Banco do Brazil could have "initiated" the transfers for the amounts Defendant posted to her account due to the Banco do Brazil's amount withdrawal limitations.

202.    Defendant could not, and lacked the authority to, post any EFTs to Plaintiff's

account while keeping her card access on hold.

203.    In violation of the Congressional mandate set forth in 15 U.S.C. §1693h(a)(1),

Defendant failed to make an EFT in accordance with the terms and conditions of Plaintiff's

account, in the correct amount or in a timely manner when properly instructed to do so by

Plaintiff.

204.    Among other things, Defendant ignored Plaintiff's instruction that a "travel

note" be put on her account and put her card access to her account on hold, resulting in

Plaintiff's inability to receive any monies from the ATMs in Brazil, even though at the time

Plaintiff's account had a positive balance.

205.    Upon information and belief, Defendant acted with the knowledge, notice, and

intent that putting Plaintiff's access to her account on hold would cause debits to accumulate

and, upon ultimately being processed, result in overdrafts, generating overdraft, non-sufficient

fund, and other fees and charges.

206.    Plaintiff incurred actual damages by being distraught, aggravated and

inconvenienced, having to repeat her withdrawal attempts which the Bank posted to her

account resulting in an overdraft and insufficient funds and attendant fees and penalties, and

also by being deprived of necessary cash amounts during her stay in a locality where credit

cards were either rejected or disfavored.

207.    In violation of the Congressional mandate set forth in 15 U.S.C. §1693d(a),

Defendant Bank failed to make available to Plaintiff written documentation described in that

Subsection at the time the transfers were initiated.

54

208.    In the alternative, if any of the correspondences from the Bank to Plaintiff are deemed to be clearly-worded documentation within the meaning of Section 1693d(a) – and they are not – Plaintiff, within 60 days after the Bank's transmission of those correspondences to her, made or caused to be made, to the Bank, and the Bank received, one or more oral or written notices of error which set forth or otherwise enabled the Bank to identify Plaintiff's name and account number; indicated her belief that the documents and notices the Bank sent to her contained errors and indicated in what amounts those errors were, and set forth the reasons for her belief that an error occurred.

209.    In violation of the Congressional mandate set forth in 15 U.S.C. §1693f(a), Defendant Bank failed to investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten (10) business days.

210.    In breach of Defendant Bank's written commitment to Plaintiff to complete its investigation within 45 days, and in violation of the Congressional mandate set forth in 15 U.S.C. §1693f(c), Defendant failed to investigate Plaintiff's notification of an error altogether, or,  in the alternative, Defendant failed to complete its investigation within forty-five (45) days from the date Plaintiff first put it on notice of error.

211.    To the extent that Defendant Bank failed to conduct its investigation altogether – or, in the alternative, failed to complete its investigation within the statutory timeframe  – Defendant Bank, in violation of the Congressional mandate set forth in 15 U.S.C. §1693f(d),

failed to deliver or mail to the consumer an explanation of its findings within three (3) business days from the date of completion.

212.    Defendant Bank failed to investigate Plaintiff's claims altogether; but even if it did, Defendant either or both (i) failed to make a good faith investigation of the alleged error; (ii) lacked a reasonable basis for believing that the consumer's account was not in error; or (iii) knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of its investigation.

213.    As a direct and proximate result of Defendant Bank's conduct as detailed hereinabove, Plaintiff sustained actual and substantial monetary loss from the posting of the charges for monies she had never received and the posting of overdraft and miscellaneous other transaction fees.

214.    As a result of all the above, Plaintiff also sustained mental anguish, emotional distress, aggravation, inconvenience, humiliation, and embarrassment.

215.    Defendants NCO and CCA are jointly liable with the Bank of America because they are persons who indirectly hold Plaintiff's account by virtue of the fact that Defendant Bank turned that account over as delinquent to NCO and, upon information and belief, CCA, too, for collections, and a substantial part of the Bank's conduct in violation of the Act has occurred during NCO's and CCA's collection activity on that account. Also, upon information and belief, Defendant Bank either assigned or caused to be assigned Plaintiff's account to either or both NCO and CCA.

216.     Plaintiff believes and is informed that many other Bank of America customers were similarly victimized and similarly sustained, _inter alia_, actual monetary loss.

217.     At all times relevant herein, Defendants acted knowingly, deliberately, willfully, wantonly, maliciously, or in reckless disregard of its customers' legal rights, entitling Plaintiff and the Class to treble damages pursuant to Section 908(e) of EFTA, 15 U.S.C. §1693f(e).

218.     Plaintiff believes and is informed that Defendants' complained-of behavior continues to this day.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

## COUNT II
### Violations of the Fair Debt Collection Practices Act
### (against Defendants NCO, CCA, and U.S. Asset Management)

219.     Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1 through 218 as though fully set forth herein.  This Count is brought on behalf of Subclasses B and C.

220.     Section 805 of the Fair Debt Collection Practices Act, captioned "Communication in connection with debt collection," provides, in relevant part:

> (b)  Communication with third parties
>
> Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in

57

connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

(c) CEASING COMMUNICATION.  If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt...the debt collector shall not communicate further with the consumer with respect to such debt...

****

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

15 U.S.C. §1692c (2010).

221.     Section 806 of the Act, captioned "Harassment or abuse," provides, in

relevant part:

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:...

****

(5)     Causing a telephone to ring...repeatedly or continuously with intent to annoy, abuse or harass any person at the called number.

(6)     ...[T]he placement of telephone calls without meaningful disclosure of the caller's identity.

15 U.S.C. §1692d.

222.     Section 807 of the Act, captioned "False or misleading  representations,"

provides, in relevant part:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> ****
>
> (2) The false representation of--
>
> (A) the character, amount, or legal status of any debt...
>
> ****
>
> (4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.
>
> ****
>
> (7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.
>
> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.
>
> ****
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.
>
> (11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is

oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

15 U.S.C.A. § 1692e (2010).

223.    Section 808 of the Act, titled "Unfair practices," provides, in relevant part:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law...

15 USCA §1692e (emphasis added).

224.    Section 809 of the Act, titled "Validation of debts," provides, in relevant part:

(a)    Notice of debt; contents

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing--

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be

60

assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(b)     Disputed debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) is disputed...the debt collector shall cease the collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or any copy of a judgment..., and a copy of such verification or judgment...is mailed to the consumer by the debt collector...Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt...

15 U.S.C. §1692g.

225.     Defendant CCA failed, ether at the time of its initial communication with Plaintiff in connection with its collection activity against her or within 5 days thereafter, to provide a debt-validation notification required under Section 809(a) of FDCPA, 15 U.S.C. 1692g(a).

226.     Defendant CCA's prerecorded automated telephone calls to Plaintiff, made on multiple occasions within a 12-month period, were harassing, oppressive, deceptive and misleading.

227.     Defendant CCA failed to provide a meaningful disclosure of its identity.

"EOCCA" is not Defendant's true business name.[3]  The alias "EOCCA" is not Defendant's

registered alias with the Illinois Secretary of State.  This omission is material because it would

foreseeably create a confusion about the debt collector's identity in the least sophisticated

consumer; and it actually confused and misled Plaintiff Solomon.  Plaintiff had never had any

prior dealings with CCA.  CCA failed to provide Plaintiff and other Class Members with a debt

validation notice or any other correspondence.  Plaintiff actually thought the automatic calls

came from NCO, and had no knowledge that NCO and CCA are separate debt collectors.  Nor

did CCA state its legal name, business address, or its official business telephone number -

instead, it only provided a callback number without specifying that it was its business

telephone number, too.

228.     Plaintiff notified Defendant NCO via her letter of April 5, 2010, that she denied

all charges, demanded to see proof, and refused to pay the debt.

229.     Upon information and belief, Defendant NCO received Plaintiff's letter on the

day after she had sent it out by first class regular mail.

230.     Plaintiff made proper and timely notice of dispute and refusal to pay her debt,

which required Defendant NCO to cease and desist from engaging in any collection activity

against her.

---

[3]     Plaintiff's counsel's investigation has shown that numerous other persons have received automated telephone calls and messages from "EOCCA," and have had difficulty finding out its true identity.  (See, e.g., http://www.debt-consolidation-credit-repair-service.com/forums/showthread.php?t=301625, last viewed Friday September 9, 2010 at 12:50 p.m. C.T.)

231. Upon information and belief, Defendant NCO has been continuously engaged in a collection activity against Plaintiff and making attempt to contact Plaintiff in spite of her April 5th letter.

232. Plaintiff believes and is informed that Defendant NCO, acting on its own or at the behest of the Bank of America, either or both (i) communicated with Defendant CCA about Plaintiff's purported debt or (ii) caused Defendant CCA to make the confusing and misleading automatically generated phone calls messages on Plaintiff's cell phone on a regular basis, with the intent to annoy, abuse, or harass her at the called number, in order to get her to make payments on her disputed debt, and to evade its non-communication obligation after receiving her April 5, 2010 letter pursuant to Section 805(c) of FDCPA, 15 U.S.C. §1692c(c).

233. Plaintiff further believes and is informed that CCA either knew or should reasonably have known that (i) Plaintiff did not owe the debt and/or (ii) Plaintiff sent correspondence to NCO and the Bank disputing her debt, demanding strict proof of the charges, and refusing to pay any portion thereof.

234. Plaintiff believes and is informed that, at all times relevant herein, Defendant Bank knew, approved, authorized, or ratified NCO's communications and transactions with CCA regarding Plaintiff's purported debt and its collection and/or CCA's collection activity, including, without limitation, the making of automated prerecorded phone calls to her cell phone.

235. Plaintiff has been receiving CCA's automated prerecorded calls at her cell phone number which she had provided only to NCO and the Bank of America.

63

236.     Upon information and belief, Defendant NCO has not verified the debt its initial March 26, 2010 letter claimed Plaintiff owed.

237.     As of the date of her mailing her April 5th letter, Plaintiff has not received in the mail any debt verification or a copy of any judgment from Defendant NCO.

238.     Defendant NCO, acting through its employee, agent, or representative, made false and misleading representations to Plaintiff by accusing her of lying and writing a bad check.

239.     In violation of the Congressional mandate set forth in 15 U.S.C. §1692g(b), Defendant NCO's representative's demeanor and statements to Plaintiff over the phone overshadowed the contents of the debt validation notice Defendant was required to provide to Plaintiff pursuant to 15 U.S.C. §1692g(a).

240.     Defendant NCO's representative's demeanor and statements to Plaintiff over the phone created a false sense of urgency, as the representative practically accused Plaintiff of having committed a criminal offense and thereby implied that, among other things, Plaintiff would soon be arrested, prosecuted, or imprisoned, and her property and wages seized, garnished, attached, or sold, in consequence of the criminal offense(s) the NCO representative accused Plaintiff of, unless she paid her debt immediately and without questioning its amount and/or validity.

241.     Plaintiff is a real estate professional in her state of residence, and is

understandably concerned about any repercussions for her liberty, property, and good name and reputation.

242.     Defendants have committed unfair practices by engaging in the collection of amounts that are not expressly authorized by Defendant Bank's agreement with Plaintiff and are not permitted by law.

243.     Plaintiff believes and is informed that Defendants have similarly victimized other customers of the Bank of America and other financial institutions which turned their accounts over to NCO and/or CCA for collection.

244.     At all times relevant herein, Defendants have acted knowingly, deliberately, willfully and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law.

245.     Plaintiff believes and is informed that Defendant's conduct, as detailed hereinabove, continues to this day.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

## COUNT III
### Violations of the Illinois Collection Agency Act
### (against NCO, CCA, and U.S. Asset Management)

246.     Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1

through 245 as though fully set forth herein. This Count is brought on behalf of members of Subclasses B and C who are residents of the State of Illinois.

247.     Defendant NCO is a "collection agency" as defined in the Illinois Collection Agency Act ("the Act").

248.     Defendants CCA and U.S. Asset Management are a "collection agency" as defined in the Act.

249.     The underlying transaction involved a "debt" within the meaning of the Act.

250.     In the State of Illinois, there is a judicially recognized private right of action for violation of the Collection Agency Act.  Sherman v. Field Clinic, 74 Ill. App. 3d 21, 392 NE 2d 154 (Ill. App. 1 Dist. 1979).

251.     The above-detailed conduct of NCO and CCA/U.S. Asset Management violated Section 9 of the Act which prohibits, inter alia:

(1)     Violations of this Act or of the rules promulgated thereunder...

****

(17)     Disclosing or threatening to disclose information relating to a debtor's indebtedness to any other person except where such other person has a legitimate business need for the information or except where such disclosure is regulated by law.

(18)     Disclosing or threatening to disclose information concerning the existence of a debt which the debt collector knows to be reasonably disputed by the debtor without disclosing the fact that the debtor disputes the debt.

66

(20)    Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist.

(21)    Failing to disclose to the debtor... the corporate, partnership or proprietary name, or other trade or business name, under which the debt collector is engaging in debt collections and which he or she is legally authorized to use...

\*\*\*\*

(25)    Failing to disclose, at the time of making any demand for payment, the name of the person to whom the claim is owed...

(26)    Misrepresenting the amount of the claim or debt alleged to be owed...

\*\*\*\*

(29)    Collecting or attempting to collect any interest or other charge or fee in excess of the actual debt or claim unless such interest or other charge or fee is expressly authorized by the agreement creating the debt or claim unless expressly authorized by law or unless in a commercial transaction such interest or other charge or fee is expressly authorized in a subsequent agreement...

\*\*\*\*

(31)    Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud or harm the public.

No debt collector while collecting or attempting to collect a debt shall engage in any of the Acts specified in this Section, each of which shall be unlawful practice.

225 ILCS 425/9 (2010).

252.    As a direct and proximate result of the foregoing violations, Plaintiff has

incurred actual harm because Plaintiff has paid for the service to the cell phone number CCA called, must pay a substantial amount when she exceeds the amount of time available to her, and CCA's calls and voicemail messages have been using up the amount of time available to Plaintiff. Plaintiff subscribes to, and pays an average of $220 a month for, a 2-line AT&T cellular telephone service plan for both herself and her father. Pursuant to her plan's terms, when Plaintiff exceeds the number of minutes she is allowed to use, she must pay substantial amounts of money. Incoming calls and checking voicemail for messages result in the depletion of the time available for Plaintiff and her father under her service package. Furthermore, Defendants' acts and omissions detailed above have caused Plaintiff emotional distress, mental anguish, aggravation, inconvenience, humiliation, and embarrassment.

253. At all times relevant herein, Defendants acted knowingly, deliberately, willfully and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law, entitling Plaintiff and the Class to the award of exemplary damages.

254. Plaintiff believes and is informed that Defendants' conduct, as detailed hereinabove, continues to this day, and will go on undeterred unless checked by an equitable decree of the Honorable Court.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of other similarly situated Illinois residents, prays for relief more fully described below.

**COUNT IV**

**Telephone Consumer Protection Act**

**(against CCA and U.S. Asset Management only)**

255.    Plaintiff restates, repleads and incorporates the allegations of paragraphs 1

through 254 as though fully set forth herein.  This Count is brought on behalf of Subclass C

only.

256.    In relevant part, the Telephone Consumer  Protection Act of 1991, 47 U.S.C.

§227, provides:

> (b) Restrictions on use of automated telephone equipment
>
> (1) Prohibitions
>
> It shall be unlawful for any person within the United States, or any person
> outside the United States if the recipient is within the United States—
> (A) to make any call (other than a call made for emergency purposes or made
> with the prior express consent of the called party) using any automatic telephone
> dialing system or an artificial or prerecorded voice—
>
> ****
>
> (iii) to any telephone number assigned to a paging service, <u>cellular telephone
> service</u>, specialized mobile radio service, or any other radio common carrier
> service, or any service for which the called party is charged for the call...

47 U.S.C. §227(b)(1)(emphasis added).

257.    Pursuant to the rule-promulgation authority granted by the TCPA, the Federal

69

Communications Commission has implemented regulations regarding prerecorded telephone messages. 47 U.S.C. §227(b)(2).

258.    Specifically, 47 C.F.R. Pt. 64.1200(b)(1) states:

(b) All artificial or prerecorded telephone messages shall:

(1) At the beginning of the message, state <u>clearly</u> the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with State Corporation Commission (or comparable regulatory authority) <u>must</u> be stated.  (Emphasis added.)

259.    The FCC further provides:

With respect to the caller's name, the prerecorded message <u>must</u> contain, <u>at a minimum</u>, the <u>legal</u> name under which the business, individual or entity calling is registered to operate. The Commission recognizes that some businesses use "d/b/as" or aliases for marketing purposes. The rule does not prohibit the use of such additional information, <u>provided the legal name of the business is also stated</u>.

<u>Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA)</u>

<u>of 1991; Final Rule</u>, F.R. Doc. 03-18766, 68 Fed. Reg. 143, p. 44163 (emphasis added).

260.    The TCPA further provides:

(5) Private right of action

A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—
(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

****

If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. §227(c)(5).

261.    Subsection (f) of the Act also provides:

(2) Exclusive jurisdiction of Federal courts
The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section or regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of such violation. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

47 U.S.C. §227(f)(2).

262.    In violation of the Congressional mandate set forth 47 U.S.C. §227(b)(1)(A), CCA made multiple non-emergency calls within a 12-month period, each time without Plaintiff's consent and either using or causing to be used an automatic telephone dialing system and artificial or prerecorded voice.

263.    In violation of the Congressional mandate set forth in 47 U.S.C. §227(b)(1)(B), within a 12-month period, CCA initiated multiple telephone calls to Plaintiff at her cell phone number.

264.    Defendants CCA and U.S. Asset Management had either actual knowledge or

71

notice that Plaintiff in fact owed no debt to Defendant Bank, NCO, or CCA/U.S. Asset Management.

265.     Defendants CCA and U.S. Asset Management' complained-of practice has victimized other consumers, debtors, and cellular phone subscribers, and continues to this day, thus warranting the grant of injunctive relief.

267.     At all times relevant, Defendants CCA and U.S. Asset Management acted knowingly, deliberately, willfully, and wantonly, or in reckless disregard of consumers' and debtors' rights under the law, thus warranting the trebling of Plaintiff's and Class Members' statutory damages.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

**COUNT V**
**Violation of Privacy**
**(against CCA and U.S. Asset Management)**

268.     Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1 through 267 as though fully set forth herein.  This Count is brought on behalf of Subclass C only.

269.     Defendant CCA committed an unauthorized intrusion or pried into Plaintiff's and other persons' seclusion by making multiple automated phone calls and leaving prerecorded telephone messages on the called persons' voicemail.

270.     An intrusion of the kind detailed hereinabove would be highly offensive or objectionable to a reasonable person.

271.     The matter intruded upon was personal.  The calls in question were made to

Plaintiff's and other persons' cell phone numbers. Plaintiff's cell phone number information neither was nor is a matter of public knowledge. Moreover, the subject matter of the calls was an actual or purported debt.

272.     The intrusion caused Plaintiff and other Class Members anguish, suffering, aggravation, inconvenience, humiliation, or embarrassment.   Also, Plaintiff and Class Members have paid for the service to the cell phone number CCA called, must pay a substantial amount of money when she exceeds the amount of time available to them, and CCA's calls and voicemail messages have been using up the amount of time available to Plaintiff and other cell phone subscribers. Plaintiff subscribes to, and pays an average of $220 a month for, a 2-line AT&T cellular telephone service plan for both herself and her father. Incoming calls and checking voicemail for messages result in the depletion of the limited amount of minutes available for Plaintiff and her father under her cell phone plan.

273.     Plaintiff believes and is informed that Defendants CCA and U.S. Asset Management have victimized other consumers and actual and purported debtors, Defendants' misconduct is ongoing, and it will go on undeterred unless checked by an equitable decree of the Honorable Court.

274.     At all times relevant herein, Defendants acted knowingly, deliberately, willfully, wantonly, and maliciously, or in reckless disregard of the victimized persons' legal rights, including, without limitation, their right to privacy and peace of mind, thereby warranting an award of exemplary damages for Plaintiff and the Class.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

73

## COUNT VI
### Breach of Contract - Implied Covenant of Good Faith and Fair Dealing
### (against Bank of America only)

275.    Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1 through 274 as though fully set forth herein.  This Count is brought on behalf of Subclass A.

276.    Plaintiff and Defendant Bank contracted for bank account deposit, checking, ATM, and debit card services.

277.    EFTA deems ATM transactions as contractual in nature by stating that "a consumer contracts for an electronic fund transfer service." 15 U.S.C. § 1693c(a).

278.    Implicit in the parties' relationship was a covenant of good faith and fair dealing.

279.    Defendant's deceptive or misleading representations and material omissions regarding its practices regarding overdrafts, posting to Plaintiff's and Class Members' accounts EFTs from which they did not benefit, failure to provide meaningful investigation of Plaintiff's and similarly aggrieved customers' claims, and other acts and omissions detailed hereinabove were in violation of the implied duty to act in good faith and deal fairly.

280.    Plaintiff and Class Members sustained actual monetary losses directly and proximately caused by Defendant's breach of the covenant of good faith and fair dealing.

281.    At all times relevant herein, Defendant acted knowingly, deliberately, willfully and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law.

282.    Plaintiff believes and is informed that Defendant's conduct, as detailed hereinabove, has victimized other consumers and continues to this day.

74

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

## COUNT VII
### Breach of Contract - Unconscionability
### (against Bank of America only)

283.    Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1 through 282 as though fully set forth herein.  This Count is brought on behalf of Subclass A.

284.    Defendant Bank's sham or superficial investigation of customers' claims, EFT-posting, overdraft-fee practice, and other practices as alleged hereinabove are substantively and procedurally unconscionable.  Among other things, Defendant Bank knowingly and deliberately:

(1)    posted charges to its customers' accounts for electronic fund transfers which, based on its internal guidelines, it should not have posted or allowed to occur;

(2)    had either knowledge or notice that electronic fund transfers could not have occurred and/or the customers to whose account they were posted did not or could not benefit from such transfers;

(3)    either did not investigate or under-investigated claims in connection with electronic fund transfers it posted to its customers accounts;

(4)    reaped revenues from overdraft and associated fees it posted to its customers' accounts with knowledge or notice that by allowing debits and other fund transfers it would cause such fees to apply to the accounts;

(5)    had a pattern or practice of failing to provide a refund or credit for an improperly posted or debited amount(s);

75

(6)     failed to clearly disclose and/or refuses to allow its customers to opt out of its overdraft policy;

(7)     failed to obtain affirmative consent from its customers prior to processing transactions that it knew or reasonably should have known would result in overdraft fees;

(8)     failed to alert its customers that a debit transaction would trigger an overdraft fee and failed to provide a reasonable opportunity for canceling such transaction;

(9)     posted transactions to accounts from the highest to the lowest amount rather than chronologically or from the lowest to the highest amount, and otherwise manipulated customers accounts and debit and other transactions so as to increase the incidence of overdraft liability subjecting the holder to one or more overdraft fees, with the object of maximizing the number of overdrafts and the frequency of overdraft fees;

(10)    failed to provide customers with true or accurate balance information and account status;

(11)    charged overdraft fees whose amounts do not bear any commercially reasonable relationship to the actual costs and risks of covering debit and other transactions resulting in overdrafts and insufficient funds;

(12)    devised, introduced, and disseminated written agreements and other documentation of the Bank's relationship with its debit cardholders which are

adhesionary, oppressive, and the products of unequal bargaining strength and

unequal knowledge and sophistication;

(13)    represented to consumers it conducted an investigation of their claims and it was

thorough, whereas it either or both (i) failed to make a good faith investigation

of the alleged error; (ii) lacked a reasonable basis for believing that the

consumer's account was not in error; or (iii) knowingly and willfully concluded

that the consumer's account was not in error when such conclusion could not

reasonably have been drawn from the evidence available to Defendant at the

time of its investigation; and

(14)    turned customers' accounts over for collection as delinquent with knowledge or

notice that their alleged debt was from debit transactions and electronic fund

transfers which neither did not could occur.

285.    Given the vast business acumen and superior bargaining power of the

Bank of America vis-a-vis Plaintiff and Defendant's other customers, the technical nature,

incomprehensibility to a lay person, and inconspicuousness of the preprinted standard-form

documents Defendant used for contracting, the allocation of risks between the parties, and the

commercial unreasonableness of the terms and conditions renders such contracts, agreements,

or understandings unenforceable as a matter of Illinois public policy.

286.    The Uniform Commercial prohibits a bank from disclaiming its ordinary

duty of care. Section 4-103(a) of the UCC provides in relevant part: "[T]he parties to the

agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise

ordinary care or limit the measure of damages for the lack or failure."

287. As a result of Defendant Bank's unconscionable practices, Plaintiff and Class Members have sustained actual monetary losses.

288. At all times relevant herein, Defendant acted knowingly, deliberately, willfully and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law.

289. Plaintiff believes and is informed that Defendant's conduct, as detailed hereinabove, continues to this day.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

### COUNT VIII
### Unjust Enrichment
### (against Bank of America only)

290. Plaintiff restates, repleads and incorporates the allegations of paragraphs 1 through 274 as though fully set forth herein. This Count is brought on behalf of Subclass A, and is brought in the alternative to Counts VI and VII as permitted by F.R.C.P. Rule 8(d).

291. Defendant Bank's conduct as detailed hereinabove is deceptive, unfair, fraudulent, unconscionable, and oppressive.

292. Defendant Bank knowingly and deliberately obtained, received, and retained pecuniary benefits from Plaintiff and the Class.

293. By acting as it did, Defendant consciously disregarded the rights of Plaintiff and the Class.

294. As a result of its conduct as detailed hereinabove, Defendant Bank has reaped millions of dollars in ill-gotten gains and become unjustly enriched thereby at the expense, and to the detriment, of Plaintiff and other customers.

78

295.     Defendant Bank's unjust enrichment is traceable to, and has resulted directly and proximately from, Defendant's conduct averred hereinabove.

296.     The fundamental principles of equity militate against Defendant's retention of the proceeds of its overdraft, non-sufficient fund, and other exactions, including the posting of charges for electronic fund transfers from which the customers and cardholders did not benefit in any way, as well as any interest, profits, or accretions therefrom.

297.     The funds in question and any profits or other financial benefits inured to Defendant by virtue of retaining those funds rightfully belong to Plaintiff and the Class. Defendant should be compelled to disgorge said monies in a common fund for the benefit of Plaintiff and the Class.   A constructive trust should be imposed on all sums received by Defendant as a result of its wrongful and inequitable conduct.

298.     Plaintiff and the Class lack an adequate remedy at law.  Plaintiff believes and is informed that Defendant's conduct continues to this day, and will go on undeterred unless checked by an equitable decree of the Honorable Court.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

**COUNT IX**
**Conversion**
**(against Bank of America only)**

299.     Plaintiff restates, repleads, and incorporates the allegations of paragraphs 1 through 298 as though fully set forth herein.  This Count is brought on behalf of Subclass A.

300.     At all times relevant herein, Defendant Bank had a duty to maintain and

preserve its customers' checking accounts and to prevent their depletion or diminishment through its own wrongful acts.

301.     Defendant Bank wrongfully charged and posted amounts for EFT transactions that did not benefit Plaintiff and similarly situated consumers and collected overdraft and other fees from Plaintiff and other customers, and has taken specific, readily identifiable funds from their accounts in satisfaction of its fees and other exactions it imposed.

302.     Defendant Bank, wrongfully and without authorization, seized, appropriated, and assumed and exercised the right of ownership over the funds belonging to Plaintiff and Class Members.

303.     Defendant Bank exercised control and dominion over the aforesaid monies in derogation of Plaintiff's and Class Members' ownership rights.

304.     Defendant Bank put the aforesaid monies to its own use and derived direct and indirect benefits therefrom.

305.     At all times relevant herein, Defendant Bank acted with knowledge that the monies belonged to Plaintiff and Class Members, and intended to permanently deprive them of those monies.

306.     Plaintiff made a demand on Defendant to return her monies.

307.     Plaintiff and the Class have an absolute and unconditional right to and are entitled to the full and immediate possession of the funds wrongfully converted by Defendant.

308.     As a result of Defendant Bank's unfair and unconscionable practices, Plaintiff and Class Members have sustained actual monetary losses.

309.     At all times relevant herein, Defendant Bank acted knowingly, deliberately,

80

willfully, and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law, thus warranting the award of punitive damages for Plaintiff and the Class.

310.    Plaintiff believes and is informed that Defendant Bank's conduct, as detailed hereinabove, continues to this day, thus warranting injunctive and other equitable relief.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

## COUNT X
### Breach of Fiduciary Duty
### (against Bank of America only)

311.    Plaintiff and incorporates the allegations of restates, repleads, and incorporates the allegations of paragraphs 1-310 as though fully set forth herein.  This Count is brought on behalf of Subclass A.

312.    At all times relevant herein, Defendant Bank had superior knowledge in relation to its retail banking customers concerning its own practices in regard to the posting of charges and imposing overdrafts and other exactions

313.    The parties' relationship involved a high degree of trust and confidence by Plaintiff.  Among other things, Plaintiff informed the Bank that she was traveling out of the country and depended on it to put a travel note on her account.  Plaintiff repeatedly communicated her ATM withdrawal problems to the Bank as the party which was in the superior position and had superior knowledge and remedial capability regarding the matter.

314.    The Bank knew or should reasonably have known of its customer's reduced financial circumstances and  heightened vulnerability when Plaintiff sought to make a cash withdrawal using a debit card.

315.    The Bank owed a heightened duty of care, loyalty, and candor to Plaintiff Solomon, including the obligation to safeguard her account from depletion through questionable electronic fund transfers and alert Plaintiff that she was exceeding the balance in order to enable her to avoid overdrafts and associated charges and fees.

316.    When Plaintiff attempted to present Defendant Bank with evidence that the withdrawals simply could not have been made due to the Banco do Brazil's limitations on withdrawal amounts, Defendant should have revisited its determination of no error and credited Plaintiff's claim.  Instead, however, Defendant Bank acted adversely toward Plaintiff in her financial predicament and hardship by reversing its previously issued temporary credits, reimposing the charges, and turning her account over for collection as delinquent.

317.    The Bank's behavior as detailed hereinabove was manifestly inconsistent with, and in breach of, its fiduciary duty to Plaintiff and other Class Members.

318.    Plaintiff and Class Members sustained actual monetary losses from Defendant Bank's breach of its fiduciary duty.

319.    At all times relevant herein, Defendant Bank acted knowingly, deliberately, willfully, and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law, warranting the award of exemplary punitive damages for Plaintiff and the Class.

320.    Plaintiff believes and is informed that Defendant's conduct, as detailed hereinabove, continues to this day and will go on undeterred unless checked by an equitable decree of the Honorable Court.

WHEREFORE, Plaintiff Morr Solomon, individually and on behalf of the Class herein, prays for relief more fully described below.

## COUNT XI
### Statutory Fraud
### (against Bank of America only)

321.    Plaintiff and incorporates the allegations of restates, repleads, and incorporates the allegations of paragraphs 1-320 as though fully set forth herein. This Count is brought on behalf of Subclass D only.

322.    At all times relevant hereto, there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. and substantially similar state consumer protection statutes (collectively, "Consumer Fraud Acts").[4]

323.    Section 2 of Illinois' Consumer Fraud Act provides, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any

---

[4]    See Ariz. Rev. Stat. Ann. § 44-1521 et seq. (Arizona); Cal. Bus. & Prof. Code § 17200 et seq. (California); Colo. Rev. Stat. § 6-1-105 et seq. (Colorado); Fla. Stat. Ann. § 501.201 et seq. (Florida); K.S.A. 50-623 et seq. (Kansas); Md. Com. Law Code Ann. § 13-101 et seq., Md. Com. Law Code Ann. § 13-301 et seq., Md. Com. Law Code Ann. § 13-408 et seq. (Maryland); Mass Gen. L. ch. 93A, § 1 et seq. (Massachusetts); Mich. Stat. Ann § 445.901 et seq., Mich. Stat. Ann. § 19.418(1) et seq. (Michigan); Minn. Stat. § 325F.68 et seq., Minn. Stat. § 8.31 (Minnesota); Mo. Rev. Stat. § 407.010 et seq. (Missouri); N.J. Rev. Stat. § 56:8-1 et seq., N.J. Rev. Stat. § 56:12-1 et seq. (New Jersey); N.M. Stat. Ann. § 57-12-1 et seq. (New Mexico); N.Y. Gen. Bus. Law. § 349 et seq. (New York); N.C. Gen. Stat. § 75-1 et seq. (North Carolina); Ohio Rev. Code Ann. § 1345.01 et seq. (Ohio); Penn. Stat. § 201-1 et seq. (Pennsylvania); Tex. Bus. & Com. Code Ann. § 17.41 et seq. (Texas); Va. Code Ann. § 59.1-196 et seq. (Virginia); and Wash. Rev. Code § 19.86.010 et seq. (Washington). The Class States' definition may be expanded or contracted by amendment based upon information to be obtained in discovery and at any time thereafter up until trial.

practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

815 ILCS 505/2(2010). This Count is also brought on behalf of the residents of Arizona, California, Colorado, Florida, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia, and Washington, under the consumer protection statutes of the states of their residence that are similar to Illinois's Consumer Fraud Act.

324.    Plaintiff and the Class Members she seeks to represent have standing to assert this claim because (i) they are consumers within the meaning of the Consumer Fraud Act and/or (ii) Defendants' practices were addressed to the market generally and/or otherwise implicate consumer protection concerns. Among other things, Defendant Bank subjects its customers and cardholders to wrongful charges accompanied with misleading or deceptive representations and material omissions, and fails to properly investigate their claims.

325.    Defendant Bank committed deceptive or unfair practices in violation of the similar state consumer protection laws. Among other things, Defendant:

(1)     posted charges to its customers' accounts for electronic fund transfers which, based on its internal guidelines, it should not have allowed to occur;

(2)     had knowledge or notice that electronic fund transfers could not have occurred and/or the customers to whose account they were posted did not or could not benefit from such transfers;

(3)     either failed to investigate altogether or under-investigated claims in connection with electronic fund transfers it posted to its customers accounts;

(4)     reaped revenues from overdraft and associated fees it posted to its customers' accounts with knowledge or notice that by allowing debits and other fund transfers it would cause such fees to apply to the accounts;

(5)     posted transactions to accounts from the highest to the lowest amount rather than chronologically, and otherwise manipulated customers accounts and debit and other transactions so as to increase the incidence of overdraft liability subjecting the holder to one or more overdraft fees, with the object of maximizing the number of overdrafts and the frequency of overdraft and associated fees per customer;

(6)     had a pattern or practice of failing to provide a refund or credit for an improperly posted or debited amount(s);

(7)     failed to clearly disclose and/or refuses to allow its customers to opt out of its overdraft policy;

(8)     failed to obtain affirmative consent from its customers prior to processing transactions that it knew or reasonably should have known would result in overdraft fees;

(9)     failed to alert its customers that a debit transaction would trigger an overdraft
        fee and failed to provide a reasonable opportunity for canceling such
        transaction;

(10)    manipulated debit transactions so as to increase the incidence of overdraft
        liability subjecting the holder to one or more overdraft fees, with the object of
        maximizing the number of overdrafts and the frequency of overdraft fees;

(11)    failed to provide customers with true or accurate balance information and
        account status;

(12)    charged overdraft fees whose amounts do not bear any commercially reasonable
        relationship to the actual costs and risks of covering debit and transactions
        resulting in overdrafts and insufficient funds;

(13)    devised, introduced, and disseminated written agreements and other
        documentation of the Bank's relationship with its account and debit cardholders
        which are adhesionary, oppressive, and the products of unequal bargaining
        strength and unequal knowledge and sophistication;

(14)    represented to consumers it conducted an investigation of their claims and it was
         thorough, whereas it either or both (i) failed to make a good faith investigation
        of the alleged error; (ii) lacked a reasonable basis for believing that the
        consumer's account was not in error; or (iii) knowingly and willfully concluded
        that the consumer's account was not in error when such conclusion could not

reasonably have been drawn from the evidence available to Defendant at the time of its investigation; and

(15)     turned customers' accounts over for collection as delinquent with knowledge or notice that their alleged debt was from debit transactions and electronic fund transfers which neither did not could occur.

326.     By creating and disseminating standardized letters and notices in which Defendant Bank assured consumers that it conducted a thorough investigations and statements in which Defendant included, or caused to be included, relatively small, easy-to-overlook overdraft, monthly maintenance, non-sufficient fund, and other charges and omitted material facts, Defendant intended for the charged customers to rely upon and assume the correctness and accuracy of Defendant's representations and omissions.

327.     Defendant Bank furthered its scheme by creating, preparing, and disseminating, or causing that to be done, for contracting with Plaintiff and other consumers, standardized, preprinted, hard-to-read contractual documents that substantively favor Defendant and disadvantage the account/cardholder and contain uniform misleading and deceptive representations and material omissions.

328.     Defendant's misrepresentations and omissions were material to Plaintiff Solomon and the Class who, had they known their debit transactions would put their accounts in the negative and that they would thus incur overdraft and associated fees, penalties, and exactions, would have either (i) refrained from debiting their accounts, (ii) bargained with

Defendant for the purchase of an overdraft protection contract, or (iii) shopped around for a bank with a more lenient and less expensive overdraft policy.

329.    Defendant's acts and omissions were in violation of Illinois' and other States' similar consumer protection laws.

330.    Defendant's acts and omissions occurred in the conduct of trade or commerce.

331.    Defendant's conduct is directed to the market generally or otherwise implicates consumer protection concerns.

332.    As a direct and proximate result of Defendant's Plaintiff Solomon and the Classes she seeks to represent have suffered actual damages in that they were deceptively and unfairly mulcted of their money via wrongful postings and exactions; which money they would have retained but for Defendant's misconduct alleged herein.

333.    At all times relevant herein, Defendant acted knowingly, deliberately, willfully and wantonly, or in reckless rights of Plaintiff's and other consumers' rights under the law, entitling Plaintiff and the Class to the award of exemplary damages.

334.    Defendant's conduct alleged herein is continuing in nature and will go on undeterred unless enjoined.

335.    Plaintiff provided to Defendant the pre-suit notice pursuant to M.G.L.A. 93A §9(3).

336.    Within 10 days from filing this action, Plaintiff will mail a copy of her complaint to the New Jersey Attorney General in compliance with N.J.S.A. 56:8-20.

## COUNT XII

### Declaratory And Other Relief Pursuant To 28 U.S.C. §§2201 and 2202

337.     Plaintiff re-alleges, restates, and incorporates the allegations of paragraphs 1

through 336 as though fully set forth herein.  This Count is brought on behalf the entire Class.

338.     There is, as detailed above, an actual controversy between Plaintiff and the

Class  Members on the one hand and  Defendants on the other hand concerning the legitimacy

of Defendant Bank's charges to Plaintiff's and other customers accounts and its dispute

resolution/claim investigation procedures; and the legitimacy of NCO's behavior in handling

the collection of Plaintiff's account.

339.     Pursuant to 28 U.S.C. §2201, this Court may "declare the rights and legal

relations of any interested party seeking such declaration, whether or not further relief is or

could be sought."

340.     Plaintiff is an interested party seeking a declaration, on behalf of herself and

the Classes they seek to represent, of their rights and legal relations vis-a-vis the Bank of

America, NCO Financial Systems, Collecto Inc. d/b/a EOS CCA and U.S. Asset Management

in regard to the unfair, deceptive, oppressive, and unconscionable course of conduct which

Defendants adopted and have carried out.

341.     Plaintiff seeks a declaration that, as alleged hereinabove, Defendant

Bank and NCO and CCA and U.S. Asset Management (as the indirect holders of the account)

violated the Electronic Fund Transfers Act; that NCO, CCA, and U.S. Asset Management

violated the Fair Debt Collection Practices Act; and that CCA and U.S. Asset Management violated the Telephone Consumer Protection Act.

342.    Section 2202 of the Act, entitled "Creation of Remedy," authorizes the Court, in its exercise of equitable discretion, to grant additional relief that it deems fair and equitable.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff Morr Solomon, on behalf of herself and all other persons similarly situated, requests this Court to decree the following relief for herself and the Class:

A.    An order declaring this action to be maintainable as a class action and appointing Plaintiff as the Class Representative and her attorneys as Class Counsel;

B.    A judgment declaring that Defendant Bank, NCO, CCA, and U.S. Asset Management violated the Electronic Fund Transfers Act; that NCO, CCA, and U.S. Asset Management violated the Fair Debt Collection Practices Act; and that CCA and U.S. Asset Management violated the Telephone Consumer Protection Act;

C.    An order enjoining Defendants from their deceptive, unfair, and unconscionable conduct;

D.    A judgment awarding compensatory and punitive damages to Plaintiff and the Class;

E.    A judgment awarding treble damages and other statutory damages pursuant to the EFTA and TCPA;

F.    A judgment awarding statutory damages pursuant to the EFTA, FDCPA, and TCPA;

G.      An order imposing constructive trust and requiring disgorgement and restitution by Defendant Bank of all monies received as a result of or in connection with the deceptive, unfair, oppressive, and unconscionable conduct alleged herein;

H.      An award of costs and disbursements of this action, including reasonable attorneys' fees and expert fees;

I.      An award of pre-judgment and post-judgment interest at the maximum rate allowed by law; and

J.      Other, further, and different relief that the Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

DATED:      September 20, 2010      **Respectfully submitted:**
**MORR SOLOMON,**
**Class Plaintiff**

By: /s/Berton N. Ring
Attorney for Plaintiff

Berton N. Ring, P.C.
123 West Madison Street, 15th Floor
Chicago, Illinois 60602
(312) 781-0290

Matthew Sheynes, Esq.
5240 North Sheridan Road, #408
Chicago, Illinois 60640
(312) 532-8711

91

## <u>NOTICE OF ATTORNEY LIEN</u>

Please take notice that the Plaintiff has retained Berton N. Ring, P.C. and Matthew Sheynes, Esq. on this matter.  Berton N. Ring, P.C. and Matthew Sheynes, Esq. shall have a claim and have an interest under the Illinois Attorneys Lien Act 770 ILCS 5/1 and for attorney fees under all retaining liens and common law rights.

By: <u>/s/Berton N. Ring</u>

Attorney for Plaintiff

Berton N. Ring, P.C.

123 West Madison Street, 15th Floor

Chicago, Illinois 60602

(312) 781-0290

Matthew Sheynes, Esq.

5240 North Sheridan Road, #408

Chicago, Illinois 60640

(312) 532-8711